Danielle Lang *(Pro Hac Vice Forthcoming)*
Jonathan Diaz *(Pro Hac Vice Forthcoming)*
Aseem Mulji *(Pro Hac Vice Forthcoming)*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
dlang@campaignlegal.org
jdiaz@campaignlegal.org
amulji@campaignlegal.org

Patty Ferguson-Bohnee, 020996
Indian Legal Clinic
Arizona State University
Sandra Day O'Connor College of Law
111 East Taylor Street
Mail Code 8820
Phoenix, Arizona 85004
Telephone: (480) 727-0420
pafergus@asu.edu

Mary R. O'Grady, 011434
Joshua D. Bendor, 031908
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012
Telephone: (602) 640-9000
mogrady@omlaw.com
jbendor@omlaw.com

Attorneys for Pascua Yaqui Tribe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| Pascua Yaqui Tribe,<br><br>        Plaintiff,<br><br>vs.<br><br>F. Ann Rodriguez, in her official capacity as Pima County Recorder,<br><br>        Defendant. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. _____ |

Plaintiff, by and through undersigned attorneys, alleges as follows:

**<u>INTRODUCTION</u>**

1.     This action challenges the Pima County Recorder's decision to close the

only in-person early voting site on the Pascua Yaqui Pueblo Reservation ("Pascua Yaqui Reservation" or the "Reservation"), which greatly diminishes the opportunity for members of the Pascua Yaqui Tribe to exercise their right to vote relative to non-Native residents of Pima County.

2.      The Pascua Yaqui Tribe has advocated for the reinstatement of the early voting location in every election since the County Recorder removed the site in 2018. Still, Pima County Recorder F. Ann Rodriguez has ignored every call on her to reinstate the early voting site on the Reservation, including now from the Pascua Yaqui Tribal Council, the Pima County Board of Supervisors, the Mayor of Tucson, and the Secretary of State. The Pascua Yaqui Tribe brings this suit only after exhausting every advocacy option available, including the unexpected rebuffing of a Pima County Board of Supervisors' action authorizing an early voting location on the Pascua Yaqui Reservation for the final week of early voting prior to Election Day.

3.      The County Recorder has time to implement the early voting location before the last week of early voting begins, as the Secretary of State stands ready to provide all the necessary resources and other counties continue to add early voting locations across the state. The Secretary of State has offered to mitigate all costs of implementation.

4.      The need for increased access to in-person early voting on the Pascua Yaqui Reservation is paramount, particularly in light of the devastating impact of the COVID-19 pandemic on tribal communities and the fact that mail voting is not an available or adequate substitute for many Native voters.

5.      After the County Recorder closed the early voting sites on the Pascua Yaqui reservation, the Pascua Yaqui Tribal Council and Native American voters engaged in both public and private advocacy and prevailed upon the County Recorder to reverse her decision and reinstate the early voting sites on tribal lands. Their advocacy efforts culminated in the successful issuance of a resolution by the Pima

2

County Board of Supervisors authorizing early and emergency voting sites on the Reservation.

6.      The Secretary of State has made clear that resources and support are available to the counties to expand early voting and increase ballot access in Native American communities. With assistance from the state, the Pascua Yaqui early voting site can be reinstated at no cost to the county or the County Recorder. And yet, the County Recorder still refuses to allow the early voting site to be reinstated on the Reservation.

7.      Residents of the Pascua Yaqui Reservation have limited access to private and public transportation. And members of the Tribe have been severely impacted by the COVID-19 pandemic, which makes traveling long distances to vote at early voting sites infeasible options for many tribal members.

8.      Without access to in-person early voting on the Pascua Yaqui Reservation, Yaqui voters will be forced to travel en masse to a single in-person polling place on Election Day, risking their health and safety and that of the public.

9.      The County Recorder's closure of early voting sites on tribal lands and subsequent refusal to reinstate or provide any additional early voting sites amid pandemic denies Native American residents in Pima County equal access to early voting sites, violates federal law, and imposes unconstitutional burdens on their fundamental right to vote.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

11.     This Court has personal jurisdiction over Defendants, who reside in this district, in their official capacities.

12.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because all the events relevant to this action occurred in the District of Arizona.

13.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## **PARTIES**

14.     Plaintiff Pascua Yaqui Tribe (the "Tribe") is a federally recognized Tribe with approximately 23,000 enrolled members. The Yaqui have lived and traveled throughout the Gila and Santa Cruz River Valleys for hundreds of years. The Pascua Yaqui Tribe has nine communities in Pima and Maricopa Counties. In 1964 a bill was passed for the transfer of 202 acres of land for the Yoeme in Pima County.  This new land, the Pascua Yaqui Reservation, also known as New Pascua, is located southwest of Tucson, Arizona.  The Tribe has now added over 2,000 acres to its reservation land base.

15.     The Tribe has standing to bring this lawsuit. Tribal members would have standing to sue in their individual capacities for the allegations set forth in the complaint. The Tribe coordinates voter outreach and education for Tribal members to participate in state and federal elections, both on and off the Pascua Yaqui Reservation. The Tribe also asserts the right to bring this claim on behalf of its members *parens patriae*. The Tribe has a strong interest in ensuring that all Tribal members are able to exercise their right to vote on Election Day. If Tribal members are unable to vote, the collective power and voice of Native American voters is reduced.

16.     Defendant F. Ann Rodriguez is the Pima County Recorder. She is sued in her official capacity. As the Pima County Recorder, Ms. Rodriguez's responsibilities include maintaining the conduct of elections in the county. *See* A.R.S. § 16-407.

## **FACTS**

### A. **Access to Safe and Accessible Early Voting Sites Is Essential to Native American Voter Access in Pima County.**

17.     Arizona permits voters to vote in person before Election Day at early voting or emergency voting sites. The county recorder must provide in-person early

voting sites at the recorder's offices starting on the day the county begins mailing absentee ballots and may establish additional in-person early voting sites throughout the county. Arizona Election Procedures Manual 63 (Dec. 2019) ("EPM") (citing A.R.S. §§ 16-246(C), 16-542(A)). In selecting early voting sites, the recorder must "ensure that all voters may reasonably access at least one early voting location." *Id.*

18.     Upon a specific resolution, the county board of supervisors may also authorize the county recorder or any other officer in charge of elections to establish and operate emergency voting sites at specified locations and times. A.R.S. § 16-511(B)(5); EPM at 65. Counties may also establish one or more ballot drop-off locations or drop boxes where voters can return mail ballots in person. EPM at 60.

19.     Early voting has become integral to exercising the franchise in Pima County. Between 2012 and 2018, Pima County closed 11 percent of its Election Day polling locations.[1] Since the U.S. Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), Pima County closed more polling locations than all but eight counties in the country.[2] In 2018, 70 percent of Pima County voters voted early, either by mail or at an early voting site.[3]

20.     The availability of in-person early voting sites is especially important for Native American voters in Pima County, many of whom live in large concentrations on or near tribal lands, including the Pascua Yaqui Reservation.

21.     The Pascua Yaqui Reservation is the social, cultural and political center of the Tribe. The Reservation and the surrounding off-reservation tribal trust land encompass about 3 square miles. The Reservation is home to at least 3,607 residents,

---

[1] The Leadership Conference Education Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote*, at 59 (Sept. 2019), http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf.
[2] *Id.* at 16.
[3] Rob Arthur & Allison McCann, *How the Gutting of the Voting Rights Act Led to Hundreds of Closed Polls*, VICE NEWS (Oct. 16, 2018), https://news.vice.com/en_us/article/kz58qx/how-the-gutting-of-the-voting-rights-act-led-to-closed-polls.

of whom more than 93 percent are Native American.[4]

22.    Like other Native American communities in Arizona and across the country, Pima County's Native American communities have been disproportionately hard hit by COVID-19. As of October 10, 2020, the Pascua Yaqui Tribe has reported 532 confirmed positive cases and 12 confirmed deaths in the Tucson area alone.

23.    Native American voters have long endured systemic socioeconomic inequities which also put them at disproportionately high risk of severe illness from COVID-19. Indeed, even before the COVID-19 pandemic, Native Americans had the highest rate of infectious disease severity and death of any racial or ethnic group, as well as high rates of immunocompromising diseases and underlying conditions that make COVID-19 particularly dangerous. Native American healthcare infrastructure is also chronically underfunded.

24.    On the Pascua Yaqui Reservation, more than a quarter of residents are medically uninsured.[5] The median household income on the Reservation is $31,241, roughly half that of Pima County, and the unemployment rate is 26 percent, not taking into account the 2020 spike in unemployment due to the COVID-19 pandemic.[6] The rate of disability on the Reservation is also far higher than in the surrounding area.

25.    The severe risks from COVID-19 among Native American communities will make it hazardous for tribal residents to vote in person in large numbers on Election Day.

26.    In addition, for many Native American residents of Pima County, voting by mail is not a trusted or viable option. Only 18 percent of Native American voters in Arizona have home mail service; white voters have home mail service at a rate over

---

[4] Ariz. Dep't of Health Services, Pascua Yaqui Tribe Primary Care Area 2019 Statistical Profile (Feb. 25, 2020), https://www.azdhs.gov/documents/prevention/health-systems-development/data-reports-maps/primary-care/pima/117.pdf ("Pascua Yaqui Statistical Profile").
[5] Id.
[6] Id.

350 percent higher than Native Americans.[7] Native American voters in Arizona generally have a low level of trust that their ballot will be counted; a recent report found that only 29.2 percent of Native American voters in Arizona have complete trust that their mail-in ballot will be counted.[8] Given historical problems with and mistrust of mail service on tribal lands, many Native Americans strongly prefer to vote in person, and for many communities, voting on Election Day has historically been a civic and community event.[9] Indeed, the Pascua Yaqui Reservation has the lowest vote-by-mail rate in Pima County, and many Native American voters on the Reservation remain unfamiliar with the process of requesting, casting, and returning a mail ballot.

27.    To avoid dangerous overcrowding at the polls in November amid COVID-19, tribal communities must have ready access to in-person early voting sites.

28.    Recognizing this reality, the Arizona Secretary of State has encouraged counties to increase access to in-person early voting sites, "where crowds tend to be smaller," especially in communities that have historically faced barriers to voting by mail.[10] Additionally, the Secretary of State has released specific recommendations for voters in tribal communities: "If you did not receive a ballot-by-mail or otherwise choose to vote in-person, we encourage you to vote early."[11]

**B. The County Recorder Abruptly Closed the Only Early Voting Site on the Pascua Yaqui Reservation.**

29.    Beginning in 2010 and up though the 2016 general election, the Pascua Yaqui Tribe had one early voting site on the Reservation. The site was located in voting

---

[7] *Hobbs*, 948 F.3d at 1006.

[8] The Native American Voting Rights Coalition, *Survey Research Report: Voting Barriers Encountered by Native Americans in Arizona, New Mexico, Nevada and South Dakota*, at 102 (Jan. 2018), https://vote.narf.org/wp-content/uploads/2018/10/2017NAVRCsurvey-full.pdf

[9] Ariz. Sec'y of State, 2020 AZVoteSafe Guide for Native Americans, (last accessed Oct. 8, 2020), https://azsos.gov/sites/default/files/AZSOS_2020_Native_American_Vote_Guide.pdf.

[10] Ariz. Sec'y of State, Guidance for Reducing COVID-19 Risks at In-Person Voting Locations (last accessed Oct. 8, 2020), https://azsos.gov/sites/default/files/AZSOS_Polling_Place_Guidance_2020.pdf

[11] 2020 AZVoteSafe Guide for Native Americans, *supra* note 9.

precinct 110 at the Tribe's radio station, adjacent to the Casino of the Sun on the northeastern edge of the Reservation. The County Recorder operated the site as a limited-access early voting site, which means the site was stocked with paper ballots only from certain precincts.

30.     After the 2016 election, in which 44 people voted at the Reservation's early voting site, the Tribe launched a get-out-the-vote campaign in the lead up to the 2018 elections. The Tribe held more than 40 voter outreach and registration events that year, and a key part of the campaign was to encourage Yaqui voters to vote early.

31.     On July 18, 2018, shortly before the August 2018 primary and midway through the get-out-the-vote campaign, the County Recorder's office informed the Tribe that it was closing the only early voting site on the Pascua Yaqui Reservation and opening a new site off-reservation.

32.     That new site, which remains the nearest early voting site to the Reservation, is located at the Mission Library. The Mission Library is at least eight miles away from the Reservation in a neighborhood that is less than 10 percent Native American.

33.     The 8-mile distance may not seem far in absolute terms, but for Yaqui people without access to a private vehicle, it makes voting early in person severely burdensome. Roughly one in five residents of the Reservation lack access to a car and must rely on public transportation. The only public transportation available to leave the Reservation is a bus, which takes at least sixty to ninety minutes to travel from the Reservation to the Mission Library early voting site. Thus, to vote early in person, many Tribal residents must travel at least *two to three* hours roundtrip. The burden here is not immaterial especially when you take into account the conditions particular to Tribal voters. *See Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 976 (D. Nev. 2016) (finding that traveling to a polling location 16 miles away is unduly burdensome).

34.     Traveling for hours by bus to vote during the COVID-19 pandemic is

dangerous. According to the United States Centers for Disease Control and Prevention, traveling by bus "for any length of time" involves sitting or standing within six feet of others, which increases the risk of getting COVID-19.[12] The dangers inherent in bus travel will deter many Tribal residents from voting early, many of whom face heightened risk of serious illness or death from COVID-19. *See supra* ¶¶ 22-25.

35.     After the closure of the Tribe's only accessible early voting site in 2018, the Pascua Yaqui Tribal Council immediately advocated to have the site reinstated. The Tribal Council wrote a letter to the County Recorder on July 25, 2018 voicing concerns about the lack of accessible in-person early voting on the Reservation and explaining that many Native American voters lack access to private transportation. The Tribal Council also offered its assistance to reestablish the site.

36.     On July 12, 2019, the Tribal Council met with the County Recorder to reiterate its concerns. The County Recorder's office refused to provide additional early voting options.

37.     On June 20 and September 12, 2019, the Tribal Council sent two additional letters to the County Recorder explaining the need for more early voting options on the Pascua Yaqui Reservation.

38.     On November 6, 2019, the Tribal Council sent a fourth letter to the County Recorder's office requesting she reinstate the Reservation's early voting site for the 2020 presidential preference election, the August primary election, and the upcoming general election. In a letter dated December 31, 2019, the County Recorder refused to reopen the site for the presidential preference election citing alleged limited funding and restrictions on the number of precincts and polling places imposed by the state for that election. She also refused to operate an early voting site on the Reservation for the 2020 primary and general elections, citing low turnout at the early voting site in

---

[12] U.S. Center for Disease Control, *Travel during the COVID-19 Pandemic* (Oct. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html.

2016.

39.    But the number of Tribal residents who would utilize an in-person early voting site on the Reservation in the 2020 election has dramatically increased due to COVID-19 and the Tribe's concerted efforts during the last ten years to increase voter turnout. For example, in the Tribe's June 1, 2020 tribal council elections, more than 454 Tribal members participated in early voting on the Pascua Yaqui Reservation, which is a *182 percent increase* from the 2016 tribal council election early voting turnout. In that election, which occurred after the onset of the COVID-19 pandemic, the Tribe offered eleven days of early voting on the Reservation.

40.    Indeed, the Tribe's efforts to restore early voting on the Reservation have rapidly accelerated and increased in urgency since the start of the pandemic. On July 17, 2020, the Tribal Council published an op-ed calling for restoration of the early voting site on the Reservation in light of the risks posed by COVID-19.[13] The Tribe also gathered more than 1,000 petition signatures in support of restoring the early voting site.[14] One member of the Pima County Board of Supervisors cited receiving more than 200 emails advocating for reinstatement of early voting on the Reservation.[15]

41.    On August 26, 2020, the members of the Tribal Council wrote to the Board of Supervisors requesting an early voting site, an emergency voting site, and a ballot drop-off location, and appeared at the Board of Supervisor's September 1, 2020 meeting to voice their concerns.

42.    On September 1, 2020, the County Recorder issued a press release about the Tribe's request to the Board of Supervisors. The press release did not justify the

---

[13] The Pascua Yaqui Tribal Council, *Pascua Yaqui Tribal Council: We need early voting site on the reservation, especially amid COVID-19*, ARIZONA DAILY STAR TUCSON (Jul. 17, 2020), https://tucson.com/opinion/local/pascua-yaqui-tribal-council-we-need-early-voting-site-on-the-reservation-especially-amid-covid/article_90b1b034-a9e6-5cf1-826b-9c323d69a4c7.html.
[14] *Id.*
[15] Calah Schlabach, *From showdown to stalemate, Pascua Yaqui voting site feud continues*, CRONKITE NEWS (Sept. 22, 2020), https://www.indianz.com/News/2020/09/22/cronkite-news-pascua-yaquitribe-denied-early-voting-site.

County Recorder's decision to remove the Tribe's only on-reservation early voting site. Nor did it acknowledge the current health risks inherent in traveling two to three hours by bus to vote. Instead, it offered a litany of "recommendations which the Pascua Yaqui leadership have not considered," compared the Pascua Yaqui Tribe's burden to those of Tohono O'odham Nation residents who must "drive 63 miles (over on hour) to reach the [only early voting] site" on the Tohono O'odham Reservation, and even called on the Tribe to establish and pay for an "Uber"-like service to transport its members to early voting sites.

43.     On September 3, 2020, the County Recorder followed the press release with a memorandum to the Board of Supervisors offering various reasons for the closure of the Reservation's only early voting site. These purported justifications included the County Recorder's alleged inability to identify where Yaqui voters live; her office's alleged inability to ensure ballot security and chain of custody at sites on the Reservation; and her personal desire to use county-owned facilities for full-service early voting sites with ballot on-demand printers and hardwired access to the county's voter registration database rather than limited-access sites.

44.     On September 8, 2020, the County Administrator informed the Board of Supervisors that operation of any emergency voting sites authorized by the Board would require access to a voter registration database and a ballot on-demand printer. The County Administrator noted that these resources are within the custody and control of the County Recorder, and she has refused to provide them to any entity outside her office.

45.     On September 15, 2020, recognizing the absence of early voting options on the Reservation, the lack of car access on the Reservation, and the unique hazards faced by Yaqui voters in light of the pandemic, the Board of Supervisors passed a resolution authorizing the County Recorder to make early voting and ballot drop-off locations available on the Reservation at the Pascua Yaqui Tribal Council Chambers

from Monday, October 26 to Friday, October 30, 2020. The resolution also authorized emergency voting at that location on Saturday, October 30 from 9:00 a.m. to 3:00 p.m. and on Monday, November 2 from 9:00 a.m. to 5:00 p.m.

46.     That day, the Tribal Council wrote to the County Recorder requesting to confer about the implementation of the Board of Supervisor's authorization for an early voting, emergency voting, and ballot drop-off location on the Reservation.

47.     On September 16, the County Recorder sent a letter to the Tribe claiming that the resolution was "drafted, introduced and adopted without [her] knowledge or consent," and offering only the following response to the Tribe's request to confer: "My suggestion to you at this point would be to contact [the Board of Supervisors] to determine exactly how THEY plan on implementing THEIR resolution." Since then, she has steadfastly refused to open the sites authorized by the Board of Supervisors or even provide access to the resources necessary to operate an emergency voting site during the three days prior to Election Day.

48.     On September 25, the Tribe sent a legal demand letter, through counsel, to the County Recorder requesting that she establish an early and emergency voting site and ballot drop-off location on the Reservation. The Tribe requested a response by October 7.

49.     On October 8, the County Recorder responded via counsel, and notified the Tribe that she had just learned that the Azul Room in the Tribal Wellness Center will be used as an Election Day polling place, and might feasibly serve as an early in-person voting site.

50.     Although the Tribal Wellness Center had already been vetted and approved by the Pima County Elections Department, the County Recorder insisted on conducting a site inspection with her own staff. A site inspection of both the Tribal Wellness Center and the Tribal Council Chambers was conducted by the County Recorder's staff on October 9.

51.     In advance of the site inspection, the Tribe provided the County Recorder with floorplans for the Tribal Wellness Center and Azul Room and information on the technology capabilities for the facility. The Tribe also made members of the Tribal Council, facilities staff, information technology staff, and police department available to respond to any questions during the site inspection.

52.     On the evening of October 9, after the site inspection had concluded, the County Recorder's counsel notified the Tribe's counsel that the Tribal Council Chambers did not meet the County Recorder's requirements for an early in-person voting location, but that the Azul Room in the Tribal Wellness Center could potentially serve as an in-person voting location—provided that certain security and accessibility concerns could be addressed.

53.     The County Recorder's staff identified a number of security and accessibility concerns during the site inspection, including the number of entry and exit points in the Azul Room, the distance from accessible parking to the entrance to the Tribal Wellness Center, the functioning of a handicap-accessible door at the main entrance to the Tribal Wellness Center, and the security and supervision of the facility while the early voting site is not in use.

54.     The Tribe committed, both during the site inspection and later via counsel, to addressing any security and accessibility concerns the County Recorder had about the proposed site. The Tribe notified the County Recorder that they are willing and able to change the locks on the entry and exit points for the Azul Room to ensure that only the County Recorder and her staff will have access to the site during early voting. The Tribe also committed to ensure that the handicap-accessible door is functioning and offered to provide overnight supervision of the site by an off-duty police officer or periodic security patrols. The Tribe also offered to set up temporary seating or a rest area between the accessible parking and main entrance of the facility.

55.     On October 10, 2020, the Tribe followed up with the County Recorder

via counsel in an attempt to reach an agreement about the proposed early voting site and address any of the County Recorder's security and accessibility concerns. As of the time of this filing, the Tribe has not received confirmation from the County Recorder as to whether her concerns are surmountable or whether she is willing to move forward with establishing an early in-person voting site on the Reservation.

**C. The County Recorder's Closure of and Refusal to Reinstate an Early Voting Site on the Pascua Yaqui Reservation Places a Disparate Burden on Native American Voters.**

56.     The County Recorder's decision to close the *only* early voting site on the Pascua Yaqui Reservation, and her continued refusal to provide any accessible early voting options on the Reservation, imposes a severely disparate burden on Native American voters.

57.     Native American voters must travel farther, longer, and amid more dangerous COVID-19 conditions to access early voting sites in Pima County as compared to non-Native American voters.

58.     The average driving distances and travel times to early voting sites in Pima County are greater for Native American voters than for any other racial or ethnic group. Indeed, the in-person early voting sites that the County Recorder has established for the 2020 election are primarily clustered in predominantly white areas of the Tucson metropolitan area.

59.     Native American communities in Pima County disproportionately face barriers or impediments to accessing early voting sites in addition to living a greater distance from early voting sites. Native American communities have the lowest rate of car access of any racial or ethnic group in Pima County, which makes traveling even short distances in absolute terms impossible without ready access to public transportation.

60.     Public transportation is less available on tribal lands than in urban and suburban areas with smaller Native American populations, requiring Native American voters to spend far more time on public transportation to access early voting sites than

14

any other racial or ethnic group. Because of the extra time spent on transit to access early voting sites, Native American voters also have fewer total hours when they can access early voting sites, which are open only certain hours, compared to voters whose travel distance is shorter or than more affluent voters who can drive themselves.

61.     And given the heightened risk from COVID-19 among Native American communities, long trips by public transportation to early voting sites impose a disproportionately dangerous risk to Native American voters' physical health and safety and the health and safety of their communities.

62.     For Native American voters on the Pascua Yaqui Reservation, the confluence of these factors makes for an especially severe burden not shouldered by the surrounding communities, which are more than 95 percent non-Native. The nearest early voting site is a two- to three-hour bus ride, and many more Tribal residents lack reliable access to private transportation than voters in surrounding neighborhoods. The vote-by-mail rate on the Reservation is the lowest in the county. And Native American voters on the Reservation are at greater risk of contracting or spreading COVID-19, forcing on them an impossible choice: abstain from voting to stay safe, brave the crowded polls on Election Day, or spend hours on public buses to vote early. This choice falls disproportionately on Native American voters of the Pascua Yaqui Reservation compared to surrounding communities.

63.     The County Recorder's denial of early voting locations follows a storied history of discrimination against Native American voters in Arizona generally, including Yaqui voters. "For over a century, Arizona has repeatedly targeted its American Indian, Hispanic, and African American citizens, limiting or eliminating their ability to vote and to participate in the political process." *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 998 (9th Cir. 2020). Yaqui voters, like other Native American voters in the state, were subject to literacy tests, voter intimidation, and outright disenfranchisement for much of their history. *See id.* at 1019-22.

64.     Yaqui voters have faced persistent barriers to the polls. Prior to 1924, Native Americans were not American citizens and could not vote in state and federal elections. After the passage of the Indian Citizenship Act of 1924, Native Americans were prohibited from registering to vote.[16] Native Americans were first disenfranchised because they were considered "wards of the nation." James Thomas Tucker et. al., *Voting Rights in Arizona: 1982-2006*, 17 S. CAL. REV. L. & SOC. JUST. 283, 285 (2008).

65.     After Native Americans secured the right to vote in 1948,[17] discriminatory literacy tests prevented most Native American voters from registering to vote. The Voting Rights Act Amendments in 1970 included a nationwide ban on literacy tests. Arizona challenged the ban on literacy tests. In upholding the ban, the United States Supreme Court found that Arizona had a "serious problem of deficient voter registration among Indians."[18] The Court noted that tribal voters may use resources in their native language in order to cast a ballot.[19] As a result, the federal government covered the state of Arizona by Section 5 of the Voting Rights Act in 1975, requiring preclearance for its election laws to prevent the implementation of racially discriminatory voting practices against Native American voters in the state. The Pascua Yaqui language was covered under the Section 203 language minority provisions of the Voting Rights Act because of the non-English speakers on their reservations. In 1988, Arizonans passed Proposition 106, mandating that state employees speak only English on the job.[20]

66.     Native Americans in Pima County continue to bear the impacts of a long history of oppression, as evidenced by disparate socioeconomic outcomes and persistent discrimination in areas such as health and education.

67.     Native American residents of the Pascua Yaqui Reservation still suffer

---

[16] *Porter v. Hall*, 34 Ariz. 308, 271 P. 411 (Ariz. 1928).
[17] *Harrison v. Laveen*, 67 Ariz. 337, 196 P.2d 456 (Ariz. 1948).
[18] *Oregon v. Mitchell*, 400 U.S. 112, 117, 132, 153 (1970).
[19] *Id.* at 146.
[20] *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997).

from disproportionately harsh socioeconomic conditions compared to the white community. Many residents on the Reservation live below the poverty line, and 24.5 percent have less than a ninth-grade education, as compared to 4.6 percent for the county. The Tribe also has limited access to healthcare and a high rate of multi-generational households, resulting in an increased rate of infection of COVID-19 compared to other communities.

68.     These socioeconomic disparities faced by Native American residents are connected to their decreased opportunity to vote. Tribal members have fewer opportunities to vote early in-person than their white counterparts. From 2010 to 2016, the Pascua Yaqui Tribe had one early voting site on the reservation. And even when the site was open in 2016, it was open for 8 hours for 4 days of early voting, a total of 32 hours, whereas off-reservation sites not in county buildings offered an average of 95 hours of in-person early voting.

69.     In addition to the closure of the Pascua Yaqui early voting site, County Recorder has closed three of the four early voting sites on the Tohono O'odham Nation. Thus, the County Recorder has closed four of the five early voting sites on tribal land since 2018.

70.     These disparities have resulted in lower turnout among Native American voters compared to their white counterparts. In the 2018 general election, the voter turnout rate was 39 percent among voters on the Pascua Yaqui Reservation, compared to 70.55 percent for the county.

71.     These burdens also disrupt the ability of Native American voters to elect candidates of their choice. Indeed, in this very election, a Native American candidate is running for Pima County Recorder. Yet Native American voters will have fewer opportunities than any other group in Pima County to ensure that their candidate of choice is elected, disrupting their ability to vote for candidates they believe will protect their equal right to vote.

**D. The County Recorder Has the Time and Resources to Ensure Equal Access to Safe and Accessible Early Voting for Native American Voters**

72.     In her communications with the Tribe, the Board of Supervisors, and the press, the County Recorder has offered various reasons for closing and now refusing to provide early voting sites on tribal lands amid pandemic.

73.     With respect to the closure on the Pascua Yaqui Reservation, the County Recorder has stated, for example, that her office was unable to find a location with sufficient security to ensure safe handling of ballots.

74.     But the Tribe has offered the Pascua Yaqui Wellness Center to the County Recorder as an option for an early voting site, which has already been approved by the Pima County Elections Department as a suitable location to host a polling site on Election Day. And the County Recorder's office operated an early voting site on the Pascua Yaqui Reservation for several election cycles. Upon information and belief, there were no reports of security breaches at that location or any early voting site on tribal land. Moreover, the Board's September 15 resolution authorized early and emergency voting and a ballot drop-off at the Pascua Yaqui Tribal Council Chambers, which has sufficient facilities to ensure ballot security.

75.     The County Recorder has also stated that she will not place an early voting site on the Reservation due to its lack of county-owned buildings, citing a preference to use county-owned facilities because they offer hardwire access to the county's voter registration database and secure Internet access for ballot on-demand printers. The County Recorder has not indicated whether this is a mere preference or an official policy of her office.

76.     Regardless, the County Recorder has deviated from this preference in establishing an early voting and emergency voting site at the Good Shepherd UCC Church in Sahuarita, Arizona. The area surrounding the Good Shepherd UCC Church is majority non-Hispanic white and less than 3 percent Native American and has high

1    rates of car access and voting by mail. The Good Shepherd UCC Church site will also

2    offer curbside ballot drop off starting October 19.

3         77.    The County Recorder has also established an early voting site at the

4    University of Arizona Student Union, which is not a county-owned building.

5         78.    In addition, the County Recorder has stated that she could operate a

6    limited-access early voting site on the Reservation, as was done for many election

7    cycles, but refuses to do so in 2020 due to her preference for full-service early voting

8    sites.

9         79.    But the County Recorder has made an exception to this "rule" as well by

10   establishing a limited-access early voting site at Salazar-Ajo Library in Ajo, Arizona

11   on the rural far-western side of Pima County. The site will be available for Ajo residents

12   only.

13        80.    The County Recorder has also stated that it is too late in the election cycle

14   to add any more early voting sites due to alleged resource constraints and an alleged

15   poll-worker shortage.

16        81.    But there is adequate time to an establish early voting site on the Pascua

17   Yaqui Reservation for the last five days of early voting which has been authorized by

18   the Board of Supervisors.

19        82.    In addition, the Arizona Secretary of State has repeatedly offered funding

20   and resources to counties for establishing early voting sites, especially on tribal lands.

21   The Secretary of State has publicly stated that she supports "any increase in early voting

22   statewide, including the request by Pascua Yaqui tribal leaders" and that the office can

23   support any expenses needed to grant the Tribe's request.[21] The Secretary of State's

24   Office has also allocated $1.5 million to increasing early voting options in tribal

25

26

27   [21] Calah Schlabach, From showdown to stalemate, Pascua Yaqui voting site feud
     continues, CRONKITE NEWS (Sept. 18, 2020),
     https://cronkitenews.azpbs.org/2020/09/18/from-showdown-to-stalemate-pascua-

28   yaqui-voting-site-feud-continues/.

                                    19

communities.[22] Many counties have used these funds to implement early voting locations on tribal reservations. The Secretary of State has even offered to hire temporary staff, procure necessary supplies, and reimburse the County Recorder for any and all costs associated with staffing and equipment.

83.     The Tribe, as well as other local officials including the Mayor of Tucson, have urged the County Recorder to take advantage of statewide resources to ensure adequate early voting options on the Pascua Yaqui Reservation.[23]

84.     The County Recorder has refused to provide such access to Native American voters exclusively at virtually every turn.

85.     The County Recorder's justifications for removing the polling sites on Native American reservations appear pretextual. She provides no excuse that could not be mitigated by the Secretary of States' offers, and she has already made exceptions to the rules she suggests to non-Native communities.

86.     The County Recorder's communications with and about the Pascua Yaqui Tribe and Native Americans are dismissive and disrespectful, invoking harmful stereotypes about Native Americans. In 2018, for example, the County Recorder stated that "They [the Pascua Yaqui] just don't like to go to the early voting site. They like to vote by mail, or they're traditionalists," invoking stereotypes of Native Americans as backward and orthodox.[24] In her September press release, the County Recorder dismissed the Tribe's sovereign and constitutional right to privacy in its internal affairs and accused the Tribe of being overly "protective of its list of members."

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301)

---

[22] *Governor Ducey, Secretary Hobbs Announce $9 Million Investment For Safe Elections Plan* (Jul. 2, 2020),
https://azgovernor.gov/governor/news/2020/07/governor-ducey-secretary-hobbs-announce-9-million-investment-safe-elections.
[23] Regina Romero, TWITTER (Sept. 1, 2020),
https://twitter.com/TucsonRomero/status/1300821029426692101.
[24] Arthur & McCann, *supra* note 2.

1

2       87.     Plaintiffs reallege and incorporate by reference the allegations in the

3   preceding paragraphs.

4       88.     Section 2 of the Voting Rights Act of 1965 prohibits any "standard,

5   practice, or procedure" which results in a "denial or abridgement of the right of any

6   citizen of the United States to vote on the account of race or color. 52 U.S.C.A. §

7   10301(a).

8       89.     A vote denial in violation of Section 2 is established when (1) a

9   challenged standard, practice or procedure results in a disparate burden on members of

10  the protected class and (2) under the "totality of the circumstances," there is a

11  relationship between the challenged practice and the "social and historical conditions"

12  of the group. *See Hobbs,* F.3d 989 at 1012; *see also Navajo Nation Human Rights*

13  *Comm'n v. San Juan Cty.*, 281 F. Supp. 3d at 1165 (quoting *Thornburg v. Gingles*, 478

14  U.S. 30, 47 (1986)).

15      90.     Defendant Rodriguez's 2018 removal of the early voting site on the

16  Pascua Yaqui Reservation, and subsequent denial of an early voting site on the

17  Reservation in subsequent elections, is a "standard, practice, or procedure" of the

18  County Recorder which lessens the opportunity for Native American voters to vote

19  safely.

20      91.     Yaqui voters continue to endure discrimination and its impacts in the

21  present day. The County Recorder's denial of an early voting site on the Reservation is

22  a vestige of that discrimination, as her refusal to implement the early voting site results

23  in the diminished opportunity for Native American voters to access the polls compared

24  to neighboring white voters.

25      92.     This denial violates Section 2 of the Voting Rights Act, 52 U.S.C.A. §

26  10301(a), because, under the totality of the circumstances, Native American voters are

27  denied an equal opportunity to meaningfully participate in the political process.

28

## SECOND CLAIM FOR RELIEF
### (Deprivation of the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983)

93.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

94.     "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure." *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992).

95.     When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

96.     The removal of early voting locations may violate the Constitution when the action disproportionally burdens racial minority voters' fundamental right to vote. See *Common Cause Indiana v. Marion Cty. Election Bd.*, 311 F. Supp. 3d 949, 954 (S.D. Ind. 2018). This burden is particularly concerning when, as could be the case here, voters are disenfranchised by the refusal to provide more accessible early voting. *See Common Cause,* 311 F. Supp. at 954; *Sanchez*, 214 F. Supp. 3d at 975-76 (finding that Native American voters lacked equal access to in-person early voting as compared to white voters).

97.     The Defendant's refusal to implement an early voting site on the Reservation is a burden on Native American voters' right to vote because they are provided fewer options to vote safely than other voters who do not live on reservations.

1  Because there is no longer an early voting location on the Reservation, Native American
2  voters who live on the Reservation must travel two to three hours to get to the closest
3  early voting location. Voters with no car must rely on public transportation to make the
4  trip, which is particularly dangerous in the present public health crisis.

5      98.     Tribal residents who are high-risk for COVID-19 in particular face an
6  impossible choice because of the burden imposed by the Defendant: abstain from voting
7  to stay safe, brave the polls on Election Day, or spend several hours on public transit to
8  vote early and risk infection.

9      99.     Any interest that the County Recorder proffers does not suffice to justify
10  this immense burden placed on Native American voters. Any cost or staffing would be
11  reimbursed or otherwise mitigated by the Secretary of State, and many locations on the
12  Reservation have or can be equipped with suitable security to ensure ballot security.
13  Perhaps more importantly, the County Recorder, the Tribe, and the Pima County
14  Elections Department have implemented early voting on the Reservation in the past
15  with no issues.

16      100.    Because the burden on the right to vote is far greater than any government
17  interest that the County Recorder could proffer, the denial of an early voting location
18  imposes an unconstitutional burden on the right to vote in violation of the First and
19  Fourteenth Amendments.

20                          **REQUESTED RELIEF**
21  WHEREFORE, Plaintiffs request that this Court:
22      1.     Enter a declaratory judgment that Defendant's actions violate the First
23             and Fourteenth Amendments, as well as Section 2 of the Voting Rights
24             Act;
25      2.     Enter preliminary and permanent injunctions ordering Defendant to
26             reestablish an early voting site and a ballot drop-off location within the
27             Pascua Yaqui Reservation;

28

3.     Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action, as authorized by the Voting Rights Act and the Civil Rights Attorneys Fees Awards Act, 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988; and

4.     Grant such other relief the Court may deem just and proper.

Dated this 11th day of October, 2020.

OSBORN MALEDON, P.A.

By    s/ Mary R. O'Grady
        Mary R. O'Grady
        2929 North Central Avenue
        Suite 2100
        Phoenix, Arizona 85012-2793

        Danielle Lang*
        Jonathan Diaz*
        Aseem Mulji*
        CAMPAIGN LEGAL CENTER
        1101 14th Street NW, Suite 400
        Washington, DC 20005

        Patty Ferguson-Bohnee
        Indian Legal Clinic
        Arizona State University
        Sandra Day O'Connor College of Law
        11 East Taylor Street
        Mail Code 8820
        Phoenix, Arizona 85004

        * Motions for admission *pro hac vice* pending

        *Counsel for Plaintiff*