Danielle Lang (*Pro Hac Vice Forthcoming*)
Jonathan Diaz (*Pro Hac Vice Forthcoming*)
Aseem Mulji (*Pro Hac Vice Forthcoming*)
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
dlang@campaignlegal.org
jdiaz@campaignlegal.org
amulji@campaignlegal.org

Patty Ferguson-Bohnee, 020996
Indian Legal Clinic
Arizona State University
Sandra Day O'Connor College of Law
111 East Taylor Street
Mail Code 8820
Phoenix, Arizona 85004
Telephone: (480) 727-0420
pafergus@asu.edu

Mary R. O'Grady, 011434
Joshua D. Bendor, 031908
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012
Telephone: (602) 640-9000
mogrady@omlaw.com
jbendor@omlaw.com

Attorneys for Pascua Yaqui Tribe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| Pascua Yaqui Tribe,<br><br>Plaintiff,<br><br>vs.<br><br>F. Ann Rodriguez, in her official capacity as Pima County Recorder,<br><br>Defendant. | Case No. 4:20-cv-00432-JAS<br><br>**EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |

Plaintiff Pascua Yaqui Tribe, by and through its undersigned counsel, hereby respectfully moves this Court for an Order preliminarily enjoining Defendant F. Ann Rodriguez, in her official capacity as Pima County Recorder (the "Recorder"), to: (1) reestablish and operate an early voting site on the Pascua Yaqui Pueblo Reservation (the "Pascua Yaqui Reservation" or the "Reservation") to serve voters from October 26 to October 30, from the hours of 9:00 a.m. to 5:00 p.m. on Monday, October 26, Wednesday, October 28, and Friday, October 30, and from the hours of 10:00 a.m. to 7:00 p.m. on Tuesday, October 27 and Thursday, October 29; (2) establish and operate an emergency voting site on the Pascua Yaqui Reservation on Saturday, October 31, from 9:00 a.m. to 3:00 p.m., and Monday, November 2 from 8:00 a.m. to 5:00 p.m.; and (3) establish a ballot drop-off site on the Pascua Yaqui Reservation for voters to utilize from October 26 to November 2. Plaintiff respectfully asks that this court grant relief for this motion by Tuesday, October 20, 2020.

## INTRODUCTION

Defendant Rodriguez's decision not to reinstate an in-person early voting site on the Pascua Yaqui Reservation deprives a historically disenfranchised Native American community of equal voting access during a pandemic that disproportionately kills Native Americans. This decision was made without any reasonable justification and in defiance of pleas from local elected officials, community leaders, and tribal members. The Pascua Yaqui Tribe (the "Tribe") has advocated for the reinstatement of the early voting location on the Reservation since Defendant Rodriguez removed it weeks before the 2018 election. After exhausting every advocacy tool in their arsenal, the Tribe is left with no choice but to seek relief from this Court as Defendant Rodriguez refuses to accommodate the Tribe's request for equal access to early in-person voting, which is supported by the Mayor of Tucson, the Pima County Board of Supervisors, and the Secretary of State. Defendant Rodriguez's response to this advocacy has displayed a shocking indifference to the needs of Native American voters in Pima County. As analyzed below, forcing Pascua Yaqui residents to travel two hours *minimum* by public

transit to the nearest early voting location is unsafe, unacceptable, and unlawful, especially during a pandemic.

## STATEMENT OF FACTS

Arizona permits voting in person before Election Day at early voting or emergency voting sites. Defendant Rodriguez is required to provide in-person early voting sites at the Recorder's offices starting on the day the county begins mailing absentee ballots and may establish additional in-person early voting sites throughout the county. Arizona Election Procedures Manual 63 (Dec. 2019) ("EPM") (citing A.R.S. §§ 16-246(C), 16-542(A)), https://azsos.gov/sites/default/files/2019 _ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf. In selecting early voting sites, the Recorder must "ensure that all voters may reasonably access at least one early voting location." *Id.* Upon a specific resolution, the Pima County Board of Supervisors (the "Board") may also authorize the Recorder or the Pima County Elections Department to establish and operate emergency voting sites at specified locations and times. A.R.S. § 16-511(B)(5); EPM at 65. Counties are also permitted to establish multiple ballot drop-off locations or drop boxes where voters can return mail ballots in person. EPM at 60.

Early voting is integral to exercising the franchise in Pima County, as Election Day voting options have been reduced in recent years. From 2012 to 2018, Pima County closed 11 percent of its Election Day polling locations, more than all but eight counties nationwide.[1] In 2018, 70 percent of Pima County voters cast their ballots early, either by mail or at an early voting site.[2] Early voting is especially important this year for Native American voters in Pima County, who live in large concentrations on or near

---

[1] The Leadership Conference Education Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote*, at 16, 59 (Sept. 2019), http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf.
[2] Rob Arthur & Allison McCann, *How the Gutting of the Voting Rights Act Led to Hundreds of Closed Polls*, VICE NEWS (Oct. 16, 2018), https://news.vice.com/en_us/article/kz58qx/how-the-gutting-of-the-voting-rights-act-led-to-closed-polls.

1    tribal lands, including the Pascua Yaqui Reservation, and strongly prefer to vote in

2    person rather than by mail.

3         Like other Native American communities in Arizona and across the country, the

4    Pascua Yaqui community has been particularly hard hit by COVID-19. As of October

5    9, 2020, Plaintiff Pascua Yaqui Tribe has reported 532 confirmed cases of COVID-19

6    in the Tucson area and 30 deaths total among its members. Ex. 24, Declaration of

7    Herminia Frias ("Frias Decl.") ¶ 34.

8         Native Americans, including voters on the Pascua Yaqui Reservation, are at an

9    especially high risk of severe illness or death from COVID-19. Ex. 20, Declaration of

10   Adalberto Renteria ("Renteria Decl.") ¶ 14. Even before the pandemic, Native

11   Americans had the highest rate of infectious disease severity and death of any racial or

12   ethnic group, as well as high rates of immunocompromising diseases and underlying

13   conditions that make COVID-19 particularly dangerous.[3] *See id.* In addition, more than

14   a quarter of residents on the Pascua Yaqui Reservation are medically uninsured. Ex. 1

15   at 2 (AZDHS Statistical Profile).[4] Tribal residents lack direct access to many medical

16   services. *Id.* at 1-4; Ex. 18, Declaration of Dr. Joseph Dietrich ("Dietrich Decl.") at 31.

17   The median household income on the Reservation is roughly half that of Pima County,

18   and the unemployment rate is 26 percent, not taking into account the 2020 spike in

19   unemployment due to COVID-19. Ex. 18, Dietrich Decl. at 16; Ex. 1 at 2. At least 46

20   percent of residents live in poverty. Ex. 18, Dietrich Decl. at 22.

21        The severe risks from COVID-19 will make it hazardous for residents of the

22   Reservation to vote in person in large numbers on Election Day. *See, e.g.*, Ex. 27,

23   Declaration of Ramona Manuel ("Manuel Decl.") ¶¶ 5-8. Voting in person, however,

24   is the most common and trusted form of electoral participation in Native American

25

26   [3] Sahir Doshi et al., *The COVID-19 Response in Indian Country: A Federal Failure*, Center for American Progress (Jun. 18, 2020).

27   [4] Exhibits 1-17 are documents in support of Plaintiff's motion, the authenticity of which is attested to in the attached declarations of Jonathan Diaz ("Diaz Decl."), attached as

28   exhibit 29, and Aseem Mulji ("Mulji Decl."), attached as exhibit 30. The remaining exhibits are declarations of Plaintiff's witnesses.

communities. *See, e.g.*, Ex. 22, Declaration of Caleb Hendricks ("Hendricks Decl.") ¶ 11 (expressing a preference for in-person voting); Ex. 25, Declaration of Jose Morillo ("Morillo Decl.") ¶ 7 (same). And in many Native American communities, voting on Election Day has been a civic and community event. Ex. 2 at 1 (SOS Guidance). Yaqui voters have not historically voted by mail and are unfamiliar with the process of requesting, casting, and returning a mail ballot. Ex. 24, Frias Decl. ¶ 35. Indeed, the Reservation has the lowest vote-by-mail rate in Pima County. Ex. 12 at 1 (CID Data); Ex. 30, Declaration of Aseem Mulji ("Mulji Decl.") ¶¶ 2-4. Thus, to avoid dangerous overcrowding at the polls on Election Day, tribal residents must have ready access to in-person early voting sites.

Recognizing this reality, the Arizona Secretary of State (the "Secretary") has encouraged counties to increase access to in-person early voting sites, "where crowds tend to be smaller," especially in communities that have historically faced barriers to voting by mail. Ex. 2 at 3. Additionally, the Secretary has released specific recommendations for voters in tribal communities: "If you did not receive a ballot-by-mail or otherwise choose to vote in-person, we encourage you to vote early." *Id.* at 3.

Beginning in 2010 and up though the 2016 general election, the Pascua Yaqui Tribe had one early voting site on the Reservation, located at the Tribe's radio station on the northeastern edge of the Reservation in voting precinct 110. Ex. 3 at 1-2 (Recorder Letter, Dec. 31, 2019); Ex. 21, Declaration of Basilio Martinez, Sr. ("Martinez Decl.") ¶ 5. The Recorder operated the site as a limited-access early voting site, which means the site was stocked with paper ballots only from certain precincts. Ex. 3 at 1. During the 2016 election, because only 44 people voted at the on-reservation early voting site, Ex. 7 at 8 (Cty. Admin. Letter, Sept. 8, 2020), the Tribe jump-started its campaign to increase turnout among Yaqui voters in the lead up to the 2018 elections. Ex. 28, Declaration of Rebekah Lewis ("Lewis Decl.") ¶ 4. The Tribe held more than 40 voter outreach and registration events that year, and a key part of the campaign was to encourage Yaqui voters to vote early. *Id.*

But on July 18, 2018, six weeks before the August 2018 primary and midway through the Tribe's get-out-the-vote campaign, the Recorder's office informed the Tribe that it was closing the only early voting site on the Reservation and opening a new site off-reservation. *Id.* ¶ 5. The closest early voting site is now 8.5 miles away at the Mission Library. *Id.* ¶ 6-7; Ex. 18, Dietrich Decl. at 7. The 17 mile-roundtrip distance imposes a severe impediment to early voting for residents of the Reservation. Ex. 18, Dietrich Decl. at 15. As many as 30 percent of residents lack access to a car and must rely on the Reservation's single public bus route to reach the site. *Id.* at 17. These residents must walk to the bus stop and take at least two public buses to reach the Mission Library, which takes at least 60 to 90 minutes each way—or two to three hours roundtrip. *Id.* at 14; Ex. 28, Lewis Decl. ¶ 7. Requiring Native American voters to travel for hours by public bus to vote early during the COVID-19 pandemic is dangerous.[5]

As early as July 25, 2018, the Tribal Council raised concerns with Defendant Rodriguez that Tribal voters would face unique difficulties accessing early voting sites off the Reservation. Ex. 26, Declaration of Peter Yucupicio ("Yucupicio Decl.") ¶ 10. The Tribal Council offered to help identify a suitable location on the Reservation, such as the Tribal Council Chambers, *id.* ¶¶ 10-18, and the Tribal Wellness Center, which will serve as an Election Day polling site in the upcoming election. Ex. 24, Frias Decl. ¶ 36; Ex. 15 at 5 (2020 Polling Place List).

After Defendant Rodriguez initially refused to consider reopening the Reservation's early voting site at a meeting with the Tribal Council, the Tribal Council wrote to her office at least three times. Ex. 26, Yucupicio Decl. ¶¶ 12-15. On November 6, 2019, the Tribal Council sent a letter to Defendant Rodriguez again, requesting she provide early in-person voting on the Reservation during the 2020 presidential preference election, the August primary election, and the upcoming November general

---

[5] U.S. Center for Disease Control, *Travel during the COVID-19 Pandemic* (Oct. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (noting that bus travel "for any length of time" involves sitting or standing within six feet of others, which increases the risk of getting COVID-19).

6

1  election. Ex. 3 at 1. In a letter dated December 31, 2019, Defendant Rodriguez again
2  refused to operate any early voting sites on the Reservation in 2020, citing low turnout
3  in past elections, a lack of funding, and restrictions from the state. *Id.* at 1-3.

4  But experience from the most recent Tribal Council elections shows that the
5  availability of in-person early voting in 2020 will substantially boost turnout on the
6  Reservation. In response to the pandemic, the Tribe implemented numerous changes to
7  its recent tribal council elections, including strict safety protocols, additional poll
8  workers, an extended receipt deadline for absentee ballots, drive-through voting for
9  early voting and Election Day, and, crucially, increased early voting opportunities. Ex.
10 23, Declaration of Ernie Gallardo ("Gallardo Decl.") ¶ 6. As a result, despite the
11 pandemic, voter turnout in tribal council elections significantly increased, and
12 participation at in-person early voting sites increased 182 percent from 2016. *See id*. ¶¶
13 10-13.

14 The pandemic has intensified the Tribe's efforts to secure accessible early voting
15 sites on the Reservation. The Tribal Council gathered more than 1,000 petition
16 signatures to support reinstatement of the early voting site.[6] *See* Ex. 5 (Petition Flyer).
17 On August 26, 2020, the Tribal Council wrote to the Pima County Board of Supervisors
18 requesting the establishment of an early voting site, an emergency voting site, and a
19 ballot drop-off location. Ex. 26, Yucupicio Decl. ¶ 20; Ex. 6 (Tribe Letter, Aug. 26,
20 2020). The Council subsequently appeared at the Board's September 1 meeting to voice
21 their concerns. Ex. 26, Yucupicio Decl. ¶ 21.

22 That same day, Defendant Rodriguez issued a press release criticizing the
23 Tribe's request to the Board. Ex. 7. The release did not explain her decision to remove
24 the Tribe's only on-reservation early voting site, nor did it acknowledge the risks posed
25 to Pascua Yaqui voters by the pandemic. *Id.* at 4-5. Instead, Defendant Rodriguez

26 ───────────────
27 [6] The Pascua Yaqui Tribal Council, *Pascua Yaqui Tribal Council: We need early voting site on the reservation, especially amid COVID-19*, ARIZ. DAILY STAR TUCSON (Jul. 17, 2020), https://tucson.com/opinion/local/pascua-yaqui-tribal-council-we-need-early-voting-site-on-the-reservation-especially-amid-covid/article_90b1b034-a9e6-5cf1-826b-9c323d69a4c7.html.

offered a number of "recommendations which the Pascua Yaqui leadership ha[d] not considered," compared the Pascua Yaqui Tribe unfavorably to members of the Tohono O'odham Nation, and suggested that the Tribe establish and pay for an "Uber"-like service to transport its members to early voting sites. *Id.* On September 3, the Recorder delivered a memorandum to the Board offering purported justifications for the closure of the Pascua Yaqui Reservation, including (1) her inability to identify where Yaqui voters live; (2) her office's inability to ensure ballot security and chain of custody at sites on the Reservation; and (3) her preference for using county-owned facilities for full-service early voting sites with ballot on demand printers and hardwired access to the county's voter registration database rather than limited-access sites. Ex. 8 at 2-3 (Recorder Mem., Sept. 3, 2020). As discussed below, none of the Recorder's shifting rationales withstand the slightest scrutiny.

On September 15, at the Tribe's urging, the Board passed a resolution authorizing the Recorder to make early voting and mail ballot drop-off available at the Pascua Yaqui Tribal Council Chambers from Monday, October 26 to Friday, October 30, 2020, and authorizing emergency voting at that location on Saturday, October 31 from 9:00 am to 3:00 pm and on Monday, November 2, 2020 from 9:00 am to 5:00 pm. Ex. 9 (Board Resolution). After the resolution passed, the Tribal Council wrote to Defendant Rodriguez again seeking to confer about implementing the Board's authorization. Ex. 26, Yucupicio Decl. ¶ 23; Ex. 10 (Tribe Letter, Sept. 15, 2020). On September 16, Defendant Rodriguez sent a letter to the Tribe claiming that the Board's resolution was "drafted, introduced and adopted without [her] knowledge or consent," and suggesting that the Tribe "contact [the Board] to determine exactly how THEY plan on implementing THEIR resolution." Ex. 11 (Recorder Letter, Sept. 16, 2020).

On September 25, the Tribe sent a legal demand letter, through their attorneys, to Defendant Rodriguez to establish an early and emergency voting site and a ballot drop-off location on the Reservation. Ex. 17 (Demand Letter, Sept. 25, 2020). The Tribe requested a response by October 7. On October 7, Defendant Rodriguez's counsel

requested one more day to respond and expressed an interest in resolving the matter without litigation. Ex. 29, Diaz Decl. ¶ 6. On October 8, Defendant Rodriquez, through counsel, notified the Tribe that she had *just learned* that the Azul Room in the Tribal Wellness Center will be used as an Election Day polling place, and might feasibly serve as an early in-person voting site. *Id.* ¶ 7. Expressing optimism for a speedy resolution, Defendant's counsel asked the Tribe to refrain from filing the instant suit in order to pursue this option, indicating that litigation would derail the discussions. *Id.* The Tribe agreed.

Although the Tribal Wellness Center had already been vetted and approved by the Pima County Elections Department, Defendant Rodriguez insisted on conducting a site inspection with her own staff. A site inspection of both the Tribal Wellness Center and the Tribal Council Chambers was conducted by Defendant Rodriguez's staff on October 9. Ex. 29, Diaz Decl. ¶ 9. In advance of the site inspection, the Tribe provided Defendant Rodriguez with floorplans for the Tribal Wellness Center and Azul Room and information on the technology capabilities for the facility. Ex. 29, Diaz Decl. ¶ 8. The Tribe also made members of the Tribal Council, facilities staff, information technology staff, and police department available to respond to any questions during the site inspection. Ex. 31, Declaration of Juliana Casillas ("Casillas Decl.") ¶ 3.

On the evening of October 9, after the site inspection had concluded, Defendant Rodriguez, via counsel, notified the Tribe that the Tribal Council Chambers did not meet the County Recorder's requirements for an early in-person voting location, but that the Azul Room in the Tribal Wellness Center could potentially serve as an in-person voting location—provided that certain minor security and accessibility concerns could be addressed. Ex. 29, Diaz Decl. ¶ 9. The Tribe committed, both during the site inspection and later in writing via counsel, to addressing any security and accessibility concerns Defendant Rodriguez had about the proposed site. *Id.* ¶ 7. The Tribe notified Defendant Rodriguez that they are willing and able to change the locks on the entry and exit points for the Azul Room to ensure that only the Defendant Rodriguez and her staff

1  will have access to the site during early voting. *Id.* The Tribe also committed to ensure

2  that the handicap-accessible door is functioning and offered to provide overnight

3  supervision of the site by an off-duty police officer or periodic security patrols. *Id.* The

4  Tribe also offered to set up temporary seating or a rest area between the accessible

5  parking and main entrance of the facility. *Id.*

6  On October 10 and 11, 2020, the Tribe followed up with Defendant Rodriguez

7  via counsel in an attempt to reach an agreement about the proposed early voting site

8  and address any of the County Recorder's security and accessibility concerns. *Id.* As of

9  the time of this filing, the Tribe has not received confirmation from the County

10  Recorder as to whether she is willing to move forward with establishing an early in-

11  person voting site on the Reservation. *Id.* ¶ 11. For the first time during these

12  discussions, Defendant Rodriguez's counsel suggested the "late stage" might make the

13  early voting site infeasible. *Id.* ¶ 10. The Tribe filed this lawsuit to ensure its members'

14  equal right to early voting is protected.

15  **ARGUMENT**

16  Defendant Rodriguez's decision to close the only in-person early voting site on

17  the Pascua Yaqui Reservation[7] places a discriminatory and undue burden on Native

18  American voters' fundamental right to vote in violation of the Constitution and federal

19  law. The Recorder's asserted justifications for refusing to reopen the early voting site

20  on the Pascua Yaqui Reservation do not excuse the resulting disproportionate burdens

21  on Tribal members' right to vote. There is a suitable site on the Reservation at the Tribal

22  Wellness Center that has been vetted and approved for use as a polling site on Election

23  Day. Other suitable sites abound. There are also abundant resources available from the

24  Secretary that would allow the Recorder to establish and operate that site at no cost to

25  her office.

26
27
28  [7] Defendant Rodriguez has also closed three of the four early voting sites on the Tohono O'odham Nation, the other Native American Reservation in Pima County. *Compare* Ex. 16 at 12-13 with Ex. 4 at 5 (showing that in 2016 the Tohono O'odham Nation had four early voting sites and in 2020 only has one site located on the Sells reservation).

Defendant Rodriguez's refusal to reinstate the Reservation's in-person early voting site during the COVID-19 crisis has a disproportionate impact on Native voters. That disparate impact, combined with historical and social conditions reflecting pervasive discrimination against Native Americans in Arizona generally and Pima County specifically, results in an unequal opportunity for Native Americans to participate in the electoral process.

## I.   Legal Standard

Plaintiffs seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). If plaintiffs raise "serious questions going to the merits and the balance of hardships tips sharply towards [them]," then a preliminary injunction may be justified "as long as the second and third *Winter* factors are satisfied." *Disney Enter., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). "Under this serious-questions variant of the *Winter* test, '[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Poder in Action v. City of Phoenix*, 2020 WL 5038582 at *4 (D. Ariz. Aug. 26, 2020) (quoting *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012)).

## II.   Plaintiff is likely to succeed on the merits.

### A.   Plaintiff is likely to succeed on its claim under Section 2 of the Voting Rights Act.

Section 2(a) of the Voting Rights Act prohibits states from imposing any voting qualification that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). "A violation … is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by racial minorities, in that they "have less

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). A Section 2 violation may "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991). The results test of Section 2 applies in both vote dilution and vote denial cases; a vote denial claim is generally understood to be any claim that is not a vote dilution claim. *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1011-12 (9th Cir. 2020) (en banc) (citing *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. 2014)).

The Ninth Circuit employs a two-step analysis when evaluating Section 2 claims. *See id.* at 1012. Other circuits have also adopted this test. *See Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016); *Lee v. Virginia State Board of Elections*, 843 F.3d 592, 599 (4th Cir. 2016); *see also Ortiz v. City of Philadelphia Office of City Comm'rs Voter Registration Div.*, 28 F.3d 306, 310 (3d Cir. 1994) (employing a similar test). First, courts examine whether the "challenged standard, practice or procedure results in a disparate burden on members of the protected class." *Hobbs*, 948 F.3d at 1012. If a disparate burden is found, the court then asks whether, under the totality of the circumstances, "there is a relationship between the challenged standard, practice, or procedure, on the one hand, and social and historical conditions on the other." *Id.* "The essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives" or to participate in the political process. *Thornburg v. Gingles*, 479 U.S. 30, 47 (1986).

When evaluating the "totality of the circumstances" to determine whether there is a legally significant relationship between the disparate impact on minority voters and the social and historical conditions affecting them, courts consider the nine Senate factors used in *Gingles*: (1) history of official discrimination in the state or political subdivision; (2) racially-polarized voting; (3) the use of unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting

practices or procedures that may enhance the opportunity for discrimination against a protected group; (4) denial of minority groups to participate in any candidate slating process; (5) discrimination against members of the minority group in the state or political subdivision in such areas of education, employment, and health, which hinder their ability to participate effectively in the political process; (6) overt or subtle racial appeals in political campaigns; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group; and (9) whether the policy underlying the voting qualification, prerequisite, standard, practice, or procedure is tenuous. *Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417, at 28-29 (1982) ("S. Rep.")).  The list of factors is neither comprehensive nor exclusive; there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other. *Hobbs*, 948 F.3d at 1013 (citing S. Rep. at 28-29).

Courts in multiple circuits have struck down standards, practices, or procedures in vote-denial cases after considering the Senate factors. *See, e.g.*, *id.* at 1013-14; *Veasey v. Abbott*, 830 F.3d 216, 244-45 (5th Cir. 2016) (en banc); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238 (4th Cir. 2014); *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. 2014). Courts have specifically considered the Senate factors in examining whether withholding polling sites imposes a vote denial in violation of the Voting Rights Act. *See Navajo Nation Human Rights Comm'n v. San Juan City*, 281 F. Supp. 3d 1136, 1164-66 (D. Utah 2017); *Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 972 (D. Nev. 2016); *see also Jacksonville Coal. for Voter Prot. v. Hood*, 351 F. Supp. 2d 1326, 1334 (M.D. Fla. 2004) (applying the totality of the circumstances test under *Gingles*).

### 1. Removing the only early voting site on the Pascua Yaqui Reservation results in a disparate impact on Native American voters.

Defendant Rodriguez's decision to close the Pascua Yaqui Reservation's only early in-person voting site in 2018 and her refusal to reinstate any early in-person voting on the Reservation amid an unprecedented pandemic has a severely disparate impact on Native American voters in Pima County. As explained by Plaintiff's expert Dr. Joseph Dietrich, the closure "has left a glaring hole in coverage for Native Americans in that area who wish to register their vote early." Ex. 18, Dietrich Decl. at 4.

The Pascua Yaqui Reservation is located in the only neighborhood in the entire metropolitan Tucson area that has seen a loss in early voting sites. *Id.* at 27. Due to Defendant Rodriguez's redistribution of early voting sites in 2018 and 2020, non-Native communities in the county have seen an *increase* in the number of early voting sites in the same period of time. *Id*. at 27. Early voting sites in Pima County "are clustered in the racially white areas of the city and away from the Native American parts of the city" favoring access for "white populations of the city." *Id.* at 12. In terms of absolute distance, the closure of the Pascua Yaqui Reservation's early voting site puts Native American voters about three to four times more distant from early voting sites than whiter areas of the Tucson region. *Id.* at 9, 13.

Moreover, Native American voters face far greater barriers in traveling any distance as compared to white voters. Native Americans on the Reservation have far lower rates of car access than surrounding neighborhoods. Ex. 18, Dietrich Decl. at 17-18. As many as 30 percent of residents on the Reservation do not own a car. *Id.* at 17. For these residents, traveling even short distances is impossible without reliable access to public transportation. But the Reservation is served by only one bus route, which does not go directly to the nearest early voting site. *Id.* at 14; Ex. 28, Lewis Decl. ¶ 7. Voters on the Reservation have to walk to a bus stop, take the bus, and transfer to a second bus, passing approximately 38 stops, before arriving at the Mission Library. Lewis Decl. ¶ 7. The one-way journey takes anywhere from one hour to one hour and

43 minutes. *Id.*; Ex. 18, Dietrich Decl. at 14. Early voting sites are open for set hours, so the long bus ride ultimately reduces the number of early voting hours that that Yaqui voters can access "relative to voters whose travel distance is shorter or more affluent voters who can drive themselves." Ex. 18, Dietrich Decl. at 16.

This burden is only exacerbated by the COVID-19 pandemic. As detailed above, Native American communities, including the Pascua Yaqui community, are at greater risk of contracting, spreading, and developing serious illness or death from COVID-19. And because voting by mail is not a trusted or reliable option in most Native American communities, shuttering the Tribe's only in-person early voting sites forces its members into impossible choices: abstain from voting altogether to keep themselves and their communities safe, risk a crowded polling place on Election Day, or spend hours confined in a public bus to vote early in person. Faced with those choices, many Yaqui voters may be unable to vote at all. *See, e.g.*, Ex. 25, Morillo Decl. ¶¶ 19-20.

Critically, these are not burdens faced by non-Native American voters in the surrounding areas. While Tribal residents must travel just under 20 miles roundtrip to the only nearby early voting site, white voters need only travel half as far and have a selection of multiple equidistant options to choose from. Ex. 18, Dietrich Decl. at 13, 27. Non-Native American voters in the surrounding areas also vote by mail at higher rates, Ex. 12; Ex. 30, Mulji Decl. ¶¶ 2-4, and have better access to both public and private transportation, Ex. 18, Dietrich Decl. at 18. Thus, focusing solely on the difference in absolute travel distance far understates the disparate burdens on Native American voters. The Recorder's decision to close early voting sites on Native American reservations while opening new sites in other neighborhoods directly widened this gap in access to early voting sites, and therefore has a disparate impact on Native Americans in  Pima County and Yaqui voters in particular.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**2.   The totality of circumstances demonstrates a relationship between the removal of the Tribe's early voting site and the social and historical conditions affecting its members and other Native Americans in Pima County and Arizona.**

Plaintiff also satisfies the second step of the Section 2 analysis because there is, under the totality of the circumstances, a "legally significant relationship between the disparate burden on [Native American] voters and the social and historical conditions affecting them." *Hobbs*, 948 F.3d at 1012.

Native American voters in Arizona—including Yaqui voters—have faced "a long history of race-based discrimination" and "[m]uch of that discrimination is directly relevant to [their] ability to register, to vote, or otherwise to participate in the democratic process." *Id.* at 1107 (internal quotations omitted). Native Americans were categorically excluded from the citizenry in the United States until 1924. Ex. 18, Dietrich Decl. at 19-20. But Arizona continued to deny Native Americans the right to vote for long thereafter. *Id.* at 20. Native Americans on reservations were barred from voting in state elections under the Arizona constitution until 1948. *Id.* And for many years, Native Americans were driven away from the polls by poll taxes, literacy tests, and violent intimidation. *Id.* Because of state-sponsored discrimination, the entire state of Arizona was included in Section 5 of the Voting Rights Act's preclearance regime. *Id.* at 21.

Native American residents of the Pascua Yaqui Reservation continue to suffer discrimination in areas such as "education, employment, and health, which hinder their ability to participate in the political process." *Gingles*, 478 U.S. at 36-37. Nearly 30 percent of Native American adults in Pima County have not completed high school, the highest share of the population of any racial or ethnic group in the county. Only about 34 percent of those who attend the one charter high school on the Reservation graduate. Ex. 18, Dietrich Decl. at 22. The median income for Tribal residents is roughly half that of the county, and lower than any other group in the county. *Id.* The poverty rate on the Reservation is at least 46 percent, *id.*, and the pre-COVID unemployment rate was 26.2

16

1   percent, Ex. 1 at 2. These economic disparities directly relate to Tribal members'

2   disparate lack of access to vehicles and heightened travel burdens in accessing an early

3   voting site off of the reservation. *See supra* Part II.A.1.

4       The Tribe also has limited access to healthcare, resulting in an increased

5   vulnerability to COVID-19 compared to other communities. More than 28 percent of

6   Tribal residents are medically uninsured, compared to 10 percent of Pima County, Ex.

7   1 at 2, and a recent analysis showed that COVID-19 cases among Native Americans are

8   1.6 times the rate of infection among the county's white residents.[8] Once again, these

9   health disparities heighten the disparate impact of the dangers of in-person voting on

10   Election Day or travel by public transportation on Native voters during this ongoing

11   health crisis. *See supra* Part II.A.1.

12       The discriminatory impact of the Recorder's decision to close the Reservation's

13   early voting site is further exacerbated by other "voting practices [and] procedures,"

14   such as limited service hours at early voting sites nearest to Native American voters

15   and limited access to other voting options. *Gingles*, 478 U.S. at 36.  Even when more

16   early voting sites were available on Native American reservations in 2016, they were

17   open for 8 hours for 4 days of early voting, a total of 32 hours, fewer than off-

18   reservation sites not in county buildings, which were open an average of 95 hours of

19   in-person early voting. *See* Ex. 16 at 12-13 (Native Vote 2016 Election Report). On the

20   Tohono O'odham Reservation, the one other Native American reservation in Pima

21   County, four early voting sites operated for 8 hours for 2 days of early voting in San

22   Xavier, 2 days of early voting in Gu Achi, 1 day of early voting in Baboquivari, and 5

23   days of early voting in Sells over the span of 2 weeks. *See id.* In 2018, the Recorder

24   closed all but one of the sites on the Tohono O'odham Nation as well. *See* Ex. 19,

25   Declaration of Dwayne Lopez ("Lopez Decl.") ¶ 9. Additionally, Native Americans are

26

27   [8] Emma Gibson, *Analysis: Native Americans Infected with COVID-19 at Higher Rates in Arizona*, ARIZ. PUBLIC MEDIA (Jul. 10, 2019), https://news.azpm.org/p/news-splash/2020/7/10/176298-analysis-native-americans-infected-with-covid-19-at-higher-rates-in-arizona.

28

1  significantly less likely to have mail delivered to their homes on tribal land. Indeed,

2  non-Hispanic white voters are 350 percent more likely to receive mail at their homes

3  than Native Americans. *Hobbs*, 948 F.3d at 1006. Consequently, only 29.2 percent of

4  Native American voters have complete trust that their mail-in ballot would be counted.[9]

5      These burdens depress turnout among Native American voters and make it more

6  difficult for them to elect candidates of their choice to public office. *See Gingles*, 478

7  U.S. at 37. In the 2018 general election, for example, voter turnout was 39 percent

8  among Pascua Yaqui voters in precinct 110 compared to 70.55 percent in Pima County

9  overall. *See* Ex. 14 at 6-7 (Pima County Canvass Excerpt). With similarly limited access

10  to early voting in this election due to Defendant Rodriguez's actions, Tribal residents

11  will not have an equal opportunity to vote for candidates of their choice, among them a

12  Native American candidate running for Pima County Recorder in the 2020 general

13  election.[10]

14      In refusing the Pascua Yaqui Tribe's many calls to reinstate early voting on the

15  Reservation, Defendant Rodriguez has displayed an alarming "lack of responsiveness .

16  . . to the particularized needs of" Yaqui voters. *Gingles*, 478 U.S. at 37. Indeed, despite

17  repeated calls for reinstatement of the early voting site on the Reservation by Tribal

18  leaders, the County Board of Supervisors, the Secretary of State, the Mayor of Tucson,

19  and others, she had not even investigated the polling location approved for use on

20  Election Day as a potential site until threatened with legal action.  And as explained

21  below in further detail, *infra* Part II.B, Defendant Rodriguez's purported justifications

22  for denying the Tribe access to an in-person early voting site on the reservation are

23  indeed "tenuous." *Id.*

24      Lastly, Defendant Rodriguez's communications with and about the Tribe are

25  dismissive and disrespectful, rely on stereotypes about Native Americans, and suggest

26
27
28

---

[9] Native American Voting Rights Coalition, *Voting Barriers Encountered by Native Americans in Arizona, New Mexico, Nevada, and South Dakota* 102 (Jan. 2018), https://vote.narf.org/wp-content/uploads/2018/10/2017 NAVRCsurvey-full.pdf.
[10] Defendant Rodriguez is not running for re-election in 2020.

racial animus. For example, in 2018, Defendant Rodriguez stated that the Pascua Yaqui "just don't like to go to the early voting site" because they are "traditionalists," invoking stereotypes of Native Americans as backward and unorthodox.[11] In a September 2020 press release, she dismissed the Tribe's sovereign and constitutional right to privacy in its internal affairs in accusing the Tribe of being overly protective of its list of members. Ex. 7 at 4. She has also used other terms to refer to Yaqui people—e.g. "they" and "them"—suggesting that the Tribe is somehow separate from the community that composes her constituency. *See* Ex. 18, Dietrich Decl. at 26. The Recorder's flat refusal to reinstate an early voting site on the Pascua Yaqui Reservation, even after other governmental officials and entities like the Secretary, Board, and Mayor offered their support, resources, and approval, can only be explained by—at best—a callous disregard for the voting rights of Native American voters.

### B. Plaintiff is likely to succeed on its claim that removing the Reservation's early voting site imposes a discriminatory and undue burden on its members' right to vote.

The Supreme Court has long recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. *Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the Plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burdens imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary

---

[11] Rob Arthur & Allison McCann, *How the Gutting of the Voting Rights Act Led to Hundreds of Closed Polls*, VICE NEWS (Oct. 16, 2018), https://news.vice.com/en_us/article/kz58qx/how-the-gutting-of-the-voting-rights-act-led-to-closed-polls.

to burden the plaintiffs' rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). This analysis is "flexible," and the "rigorousness of [the court's] inquiry" increases with the severity of the burden. *Id.* But when a burden on the right to vote is severe or discriminatory, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (citing *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

Defendant Rodriguez's shuttering of early voting sites on the Pascua Yaqui Reservation effectively requires Tribal members to travel for hours at great personal risk to their health and the health of those around them in order to cast their ballots, thereby imposing a severe and discriminatory burden on their right to vote.

"The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *see also id.* at 106 (finding that voting procedures that "vary not only from county to county but indeed within a single county" are not "sufficient [to] guarantee[] equal treatment"); *see, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). As explained in detail above, *supra* Part II.A.1, the severe and discriminatory burden imposed by the Recorder's decision to close the Tribe's early voting site lands almost exclusively on Native American voters.

On the other side of the balance, none of the reasons Defendant Rodriguez has offered for closing the early voting site on the Reservation find support in the facts, and none justify the severe and discriminatory burdens that her decisions impose on Native voters in Pima County.

Defendant Rodriguez has claimed that her office was unable to find a suitable location on the Reservation with sufficient security to ensure safe handling of ballots.

Ex. 29, Diaz Decl. ¶ 6. But, critically, the Reservation will have an Election Day voting site that the Pima County Elections Department, which administers Election Day voting, *has already deemed suitable and secure for in-person voting*. Ex. 15 at 5.  In addition, the Recorder's office operated an early voting site on the Reservation for several years and multiple election cycles, with no reports of security breaches at that location or any early voting site on tribal land. *See* Martinez Decl. ¶ 5. Moreover, the Board's September 15 resolution authorized early and emergency voting at the Pascua Yaqui Tribal Council Chambers, a location with sufficient facilities to ensure ballot security. Ex. 9. Finally, the Tribe has stood ready and willing to discuss suitable locations and address security concerns with the Recorder for years now without success.

Defendant Rodriguez has also stated a preference for using county-owned buildings for early voting sites because they provide hardwire internet access to the county's voter registration database and ballot on-demand printers; however, the Recorder has deviated from this preference to establish early voting sites in other, non-tribal communities, including the University of Arizona Student Union in Tucson and the Good Shepherd UCC Church in Sahuarita, Arizona. Ex. 4 at 4 (2020 Early Voting Sites). The census tract encompassing the Student Union is primarily non-Hispanic white and less than 3 percent Native American. Ex. 12 at 3-4; Ex. 30, Mulji Decl. ¶¶ 2-4. Sahuarita is majority non-Hispanic white and no more than 0.2 percent Native American;[12] it also enjoys high rates of car access and vote-by-mail. Ex. 12 at 1-2; Ex. 30, Mulji Decl. ¶¶ 2-4. In response to the Tribe's suggestion that Defendant Rodriguez establish a limited-access early voting site on the Reservation, she stated a similar preference for "full-service" early voting sites rather than limited-access sites and refused to establish one. Ex. 3; Ex. 8. But Defendant Rodriguez has made an exception

---

[12] U.S. Census Bureau, *2018: ACS 5-Year Estimates Data Profiles, Sahuarita, Ariz.*, Table                                    DP05                                    (2018), https://data.census.gov/cedsci/table?q=Sahuarita%20town,%20Arizona&g=1600000US0462140&tid=ACSDP5Y2018.DP05&hidePreview=false.

to this preference as well by establishing a limited-access early voting site at Salazar-Ajo Library in Ajo, Arizona. Ex. 4. Suitable sites exist on the Pascua Yaqui Reservation, and Defendant Rodriguez's excuses for not using them are nothing more than pretext.

Defendant Rodriguez has also said that it is too late in the election cycle to add any early voting sites due to resource constraints and a poll worker shortage. Ex. 8.[13] These concerns are unfounded. The Tribe is not seeking the operation of the early voting site for another two weeks and the establishment of an additional, more convenient site for Yaqui voters will result in greater access to voters without any resulting voter confusion. The Secretary of State has made clear to Defendant Rodriguez and her colleagues in other counties that funding and resources remain available for establishing early voting sites, especially to increase voting access on tribal lands. Ex. 13. The Secretary has publicly stated that she supports "any increase in early voting statewide, including the request by Pascua Yaqui tribal leaders" and that her office is able to cover any expenses needed to establish such sites on the Pascua Yaqui Reservation.[14] The Secretary has even offered to reimburse the Recorder for all costs associated with hiring temporary staff and procuring necessary equipment and supplies to operate these sites, from funds that other counties have used to implement early voting on reservations. Ex. 13. at 1. More than 2,500 volunteers have signed up to be poll workers in Pima County through the Secretary's office. *Id.* at 3. Support has also been offered by the Mayor of Tucson and the Board of Supervisors.[15] Yet Defendant Rodriguez steadfastly refuses to ensure access to early voting on the Pascua

---

[13] Defendant Rodriguez also cannot be heard to decry the "late stage" of this litigation given her requests through counsel to delay filing in order to pursue resolution without the court and then her failure to follow through with those discussions.

[14] Calah Schlabach, *From Showdown to Stalemate, Pascua Yaqui Voting Site Feud Continues*, CRONKITE NEWS (Sept. 18, 2020), https://cronkitenews.azpbs.org/2020/09/18/from-showdown-to-stalemate-pascua-yaqui-voting-site-feud-continues.

[15] *See* Regina Romero (@TucsonRomero), TWITTER (Sept. 1, 2020), https://twitter.com/TucsonRomero/status/1300821029426692101; Ex. 9.

1   Yaqui Reservation. Whatever minimal administrative burden may inure to the Recorder

2   in establishing the site is vastly outweighed by the severe burden on Yaqui voters.

3       Defendant Rodriguez's reasons for closing and refusing to reinstate the early

4   voting site on the Pascua Yaqui Reservation do not justify the resulting severe burden

5   that those decisions impose on Native American voters. She provides no excuse that

6   could not be mitigated or resolved by the resources available to her from the Secretary's

7   office, and she has already made exceptions in non-Native communities to the

8   purported rules that allegedly stop her from implementing early voting sites on tribal

9   lands.

10   **III.    Plaintiff will suffer irreparable harm absent the requested relief.**

11       In the Ninth Circuit, "[i]rreparable harm is traditionally defined as harm for

12   which there is no adequate legal remedy, such as an award of damages." *Arizona Dream*

13   *Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). To obtain a preliminary

14   injunction, plaintiffs must "demonstrate that irreparable injury is likely in the absence

15   of preliminary relief. Mere possibility of harm is not enough." *Enyart v. Nat.*

16   *Conference of Bar Exam'rs*, *Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011). Both the Ninth

17   Circuit and Supreme Court "have repeatedly held that the loss of First Amendment

18   freedoms, for even minimal periods of time, unquestionably constitutes irreparable

19   injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) (citing

20   *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Melendres v. Arpaio,* 695 F.3d 990,

21   1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights

22   'unquestionably constitutes irreparable injury'" (quoting *Elrod*, 427 U.S. at 373).  And

23   "it is clear that the abridgment of the right to vote constitutes irreparable injury."

24   *Arizona Democratic Party v. Arizona Republican Party*, No. CV-16-03752-PHX-JJT,

25   2016 WL 8669978, at #11 (D. Ariz. Nov. 4, 2016).

26       Without access to an early voting site on the Pascua Yaqui Reservation,

27   numerous Native American voters will be unable to cast their ballots in the 2020 general

28   election. Those who manage to cast their ballots will only be able to do so after enduring

1   hours of travel and risking their lives and the lives of their families and communities

2   by unnecessarily exposing themselves to COVID-19.

3          Conversely, there is no harm to the Recorder if the requested relief is granted.

4   As detailed further above, *supra* Part II.B, the Secretary has made resources available

5   to the Recorder to offset the cost of establishing and operating an early or emergency

6   voting site on the Pascua Yaqui Reservation, and the Tribal Council and Pima County

7   Board of Supervisors have pledged their support for the site. None of the Recorder's

8   claimed justifications are supported by the evidence, and she will face no irreparable

9   harm if she is required to reinstate the site.

10  **IV.     The balance of the equities and the public interest favor granting the requested relief.**

11

12         "When the government is a party, the[] last two [preliminary injunction] factors

13  merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Because

14  of its "fundamental" character, preservation of the right to vote is a compelling interest,

15  *Ariz. Democratic Party*, 2016 WL 8669978, at *12. The public interest is best served

16  by allowing all eligible voters to have equal opportunity to exercise their fundamental

17  right to vote. *Id.* ("[B]oth Plaintiff and the public have a strong interest in allowing

18  every registered voter to do so freely.")

19                                  **CONCLUSION**

20         For the foregoing reasons, Plaintiff respectfully requests that the Court enter an

21  Order granting their motion for a preliminary injunction and such further relief as it

22  deems just and proper.

23         Dated this 13th day of October, 2020.

24                                          OSBORN MALEDON, P.A.

25                                  By      s/ Mary R. O'Grady
                                            Mary R. O'Grady
26                                          Joshua D. Bendor
                                            2929 North Central Avenue
27                                          Suite 2100
                                            Phoenix, Arizona 85012-2793
28

Danielle Lang*
Jonathan Diaz*
Aseem Mulji*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005

Patty Ferguson-Bohnee
Indian Legal Clinic
Arizona State University
Sandra Day O'Connor College of
Law
11 East Taylor Street
Mail Code 8820
Phoenix, Arizona 85004

* Motions for admission *pro hac
vice* pending

*Counsel for Plaintiff*