Eric H. Spencer (#022707)
Brett W. Johnson (#021527)
Colin P. Ahler (#023879)
Ryan J. Regula (#028037)
Derek C. Flint (#034392)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Email: espencer@swlaw.com
       bwjohnson@swlaw.com
       cahler@swlaw.com
       rregula@swlaw.com
       dflint@swlaw.com
*Attorneys for Defendant F. Ann Rodriguez*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Pascua Yaqui Tribe,<br><br>    Plaintiff,<br><br>v.<br><br>F. Ann Rodriguez, in her official capacity as Pima County Recorder,<br><br>    Defendant. | No. CV-20-00432-TUC-JAS<br><br>**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**<br><br>Assigned to Hon. James A. Soto<br><br>Hearing: October 19, 2020 at 1:00 p.m. |

## Introduction

The November 3, 2020 election (the "General Election") is a mere 19 days away. But, for all intents and purpose, it is already well underway. Across Arizona, voters have been casting early ballots by mail and at in-person early voting sites for over a week.

Despite having ample notice of the facts underlying their claims for months or even years (after all, the on-reservation early voting site they seek to replace was discontinued after the 2016 General Election), Plaintiff (or the "Tribe") waited until the eleventh hour to file this lawsuit and its Motion for Preliminary Injunction (the "Motion") seeking an extraordinary remedy: implementation of a brand new on-reservation early-voting ("OREV") site after early voting has already begun. Granting the Motion at this late stage would place a tremendous burden on election officials and threaten to introduce disarray into the administration of Pima County's election. Establishing an early voting site is a process that takes months, not days, and election administrators cannot afford to devote additional resources to that process at this late hour while the General Election is underway. This is precisely why the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020). The Court should deny the Motion on this ground alone. *See id.*

As to the merits, Plaintiff fails to present evidence to show a likelihood of success on its claims under Section 2 of the Voting Rights Act ("VRA") or the U.S. Constitution. The § 2 claim is highly unlikely to succeed because, among other things, Plaintiff has presented no evidence, quantitative or otherwise, to show that the absence of an OREV site has had a disparate impact on the ability of its members ("Tribal Members") to cast a ballot. As for Plaintiff's claim of an unconstitutional burden on Tribal Members' right to vote, Recorder Rodriguez's decision of where to place early voting sites for the General Election is well-founded in legitimate and compelling governmental interests, including the need to preserve electoral resources, protect the integrity and security of the General Election, and comply with the Americans with Disabilities Act ("ADA"), that far outweigh the asserted

burden on Tribal Members from not having an OREV site. The Court should deny the Motion accordingly.

## Argument

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted). The Court may only grant Plaintiff the "extraordinary remedy" of a preliminary injunction if it establishes: (1) it is "likely to succeed on the merits" of its claims; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008). "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the [other] *Winter* factors are satisfied." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Here, however, Plaintiff cannot satisfy any of the four *Winter* factors.

### I. Plaintiff Is Unlikely to Succeed on the Merits of Any of Its Claims.

#### A. Plaintiff Lacks Standing.

For the reasons stated in Recorder Rodriguez's Motion to Dismiss, (Doc. 17), Plaintiff's claims should be dismissed for lack of standing.

#### B. Plaintiff Cannot be Awarded Late-Requested Relief Pursuant to the *Purcell* Doctrine.

Plaintiff's inexplicable delay in bringing its claims violates the familiar *Purcell* principle, which holds that election rules, procedures, and processes should not be changed on the eve of an election. This rule originated in *Purcell v. Gonzalez*, where the Supreme Court vacated an order enjoining Arizona from enforcing a requirement that voters present proof of citizenship when they register to vote. 549 U.S. 1, 2 (2006). In holding that courts should refrain from issuing last-minute orders that affect elections, the Supreme Court emphasized the importance of preserving the integrity of the entire election process. *See id*.

at 4 ("Confidence in our electoral processes is essential to the functioning of our participating democracy."). Following *Purcell*, the Supreme Court has repeatedly reaffirmed its importance and continuing applicability. *See, e.g.*, *Republican Nat'l Comm.*, 140 S. Ct. at 1207 ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter rules on the eve of an election."); *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (affirming the district court's denial of a preliminary injunction when a new districting scheme would not be timely completed in advance of the 2018 election season); *see also N.C. State Conference of NAACP v. McCroy*, 214 F. Supp. 3d 466, 472 (M.D.N.C. 2016) (applying *Purcell* principle to changes to early-voting sites).

Just last week, the Ninth Circuit applied *Purcell* when it stayed an eleventh-hour injunction issued by the District Court of Arizona, reasoning that "as we rapidly approach the election, the public interest is well served by preserving Arizona's existing election laws, rather than by sending the State scrambling to implement and to administer a new [election] procedure." *Ariz. Democratic Party v. Hobbs*, 2020 WL 5903488, at *8-9 (9th Cir. Oct. 6, 2020). A few days ago, the Ninth Circuit issued a stay of a different, last-minute District Court decision upending Arizona's voter registration deadline, again citing *Purcell* and noting that plaintiff's "extremely late filing relative to the deadline is a factor supporting the government's likelihood of success on the merits." *Mi Familia Vota v. Hobbs*, 2020 WL 6044502, at *3 (9th Cir. Oct. 13, 2020). Just today, the Ninth Circuit again reiterated that delay in bringing election-related matters bars effective review and must therefore bar relief in all but the most egregious cases that were not known *before* the election began (which is not the case here). *Yazzie v. Hobbs*, 2020 WL 6072861, at *4 (9th Cir. Oct. 15, 2020) ("Dismissal of this last-minute challenge to a decades-old rule should be fair notice to plaintiffs . . . ."). That reasoning applies with ever-greater force as the General Election approaches. *See id.*

Here, Plaintiff demands that a brand-new early voting site be operational mere days after this Court renders a decision and only nine days before the General Election. It makes this demand after failing to participate in political processes that could have resolved its

concerns in a timely, non-litigious fashion: Plaintiff did *not* participate in two public hearings regarding emergency voting and early-voting locations. (Ex. A, Roads Decl. at ¶ 43). Granting Plaintiff's request now would undoubtedly send Recorder Rodriguez "scrambling to administer" the order and would place a tremendous strain on the resources of her office. *Ariz. Democratic Party v. Hobbs*, 2020 WL 5903488, at *8-9. Among other things, Plaintiff's requested injunction would require the Recorder's Office to: (1) hire, train, and deploy at least 7-10 additional poll workers to staff the OREV site—a task that has already been incredibly difficult to accomplish at other early-voting locations due to the COVID-19 pandemic; (2) substantially modify a non-ADA-compliant site to comply with federal and state regulations; (3) supply hundreds of pounds of equipment to the OREV site on short notice; (4) stock the OREV site with pre-printed early ballots, which cannot feasibly be printed before Election Day; and (5) modify the OREV site to ensure adequate security measures are in place. (Ex. A at ¶¶ 49-53). In addition, Plaintiff's requested injunction would require Recorder Rodriguez to obtain a new ballot drop-box, even though the Secretary of State has indicated they are no longer available this close to the election. (*Id.* at ¶¶ 58-59). These processes normally take months to plan and implement, not days, and many simply cannot be completed before Election Day. (*Id.* at ¶ 53). What's more, diverting the Recorder's Office's limited resources from existing tasks to plan, establish, supply, and staff an OREV site at this late date—when the Office is absorbed with other critical election-related duties—threatens orderly administration of the General Election. These outcomes are precisely what *Purcell* is intended to prevent.

Plaintiff suggests that Recorder Rodriguez cannot second-guess the timing of this lawsuit because, on October 7, 2020, her counsel allegedly asked Plaintiff to consider postponing filing while a last-ditch site visit was being contemplated. (Doc. 13 at 9, 22). This argument does not hold water. Even if Plaintiff had filed this lawsuit on October 7, 2020, its delay would have still been inexcusable because Plaintiff could have brought its claims *years ago*. By Plaintiff's own admission, the Recorder's Office informed Plaintiff it was closing the OREV site at the Tribe's radio station on July 18, 2018—more than two

years ago. (*Id.* at 6-7).[1] And between 2018 and 2020, Recorder Rodriguez conferred with Tribal Council leaders multiple times to look for viable solutions, but came up emptyhanded. (Ex. A at ¶ 43). Concerning the 2020 cycle, the Recorder Rodriguez informed Plaintiff on January 6, 2020 that she did not plan to operate an OREV site "for either the Primary or the General Elections in 2020." (Doc. 4-3 at 14). Thus, Plaintiff had at least *nine months' notice* of this issue, and it has no legitimate excuse for waiting until three weeks before the General Election to file suit.

### C. Plaintiff's Claims are Barred by the Laches Doctrine.

For the reasons stated in Recorder Rodriguez's Motion to Dismiss, (Doc. 17), Plaintiff's claims are barred by laches.

### D. Plaintiff Fails to Prove the Lack of an OREV Site Violates § 2 of the VRA.

The Court need not reach the merits of Plaintiff's § 2 claims. If it does, they fail. Section 2 of the VRA prohibits governments from implementing any "practice or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). The Ninth Circuit uses a two-step approach to evaluate vote-denial challenges under the "results test" of § 2. In the first step, courts "ask whether, 'as a result of the challenged practice or structure[,] plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1012 (9th Cir. 2020) (en banc), *cert. granted*, (U.S. Oct. 2, 2020) (Nos. 19-1257, 19-1258).[2] To make the required showing at this step, "proof of 'causal connection between the challenged voting practice and a prohibited discriminatory result' is crucial." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (quoting *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997)); *Yazzie v. Hobbs*, No. CV-20-08222-PCT-

---

[1] This is factually distinguishable from *Jacksonville Coalition For Voter Protection v. Hood*, where the plaintiffs first became aware of limited voting sites less than three months before the election. *See* 351 F. Supp. 2d 1326, 1332 (M.D. Fla. 2004).

[2] The Ninth Circuit has stayed its mandate in *Hobbs* pursuant to Federal Rule of Appellate Procedure 41. *See Democratic Nat'l Comm. v. Hobbs*, Case No. 18-15845 (9th Cir. Feb. 11, 2020) (Doc. 127) (order).

GMS, 2020 WL 5834757, at *3 (D. Ariz. Sept. 25, 2020), *affirmed on other grounds by Yazzie*, 2020 WL 6072861 (9th Cir. Oct. 15, 2020). In other words, "a § 2 challenge 'based purely on a showing of some relevant statistical disparity between minorities and whites,' without any evidence that the challenged voting qualification causes that disparity, will be rejected." *Id.* (quoting *Smith*, 109 F.3d at 595). Notably, "a bare statistical showing of disproportionate *impact* on a racial minority" does not satisfy this step. *Smith*, 109 F.3d at 595 (emphasis in original). If a party does not make the requisite showing at step one, its § 2 claim fails. *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d at 1012.

Step two requires courts to "ask whether, under the 'totality of the circumstances,' there is a relationship between the challenged 'standard, practice, or procedure,' on the one hand, and 'social and historical conditions' on the other."[3] *Id.* To determine whether there is a violation, the court "consider[s], as appropriate, factors such as those laid out in the Senate Report accompanying the 1982 amendments to the VRA." *Id.*

Here, Plaintiff is highly unlikely to succeed on its VRA claim because it has not demonstrated that the lack of an OREV site fails either step of the § 2 test.

1. <u>Plaintiff presents no evidence of a causal nexus.</u>

Plaintiff's Motion should be denied because it skips the first step of the § 2 analysis entirely, failing to present any evidence that the lack of an OREV site causes a "prohibited discriminatory result." *Gonzalez*, 677 F.3d at 405. "Only a voting practice that results in discrimination gives rise to § 2 liability." *Smith*, 109 F.3d at 595. And failure to provide evidence that the challenged practice "result[s] in [a minority group] having less opportunity to participate in the political process" is fatal. *Gonzalez*, 677 F.3d at 407.

For example, in *Gonzalez*, the plaintiffs claimed that a statute requiring voters to

---

[3] Step two has been heavily criticized by other circuits, and its validity is at issue in *Hobbs*, where the U.S. Supreme Court recently granted *certiorari*. As the Eleventh Circuit has explained, the Senate Report factors apply in vote-dilution cases, but "cannot" sensibly "apply" in "vote denial" cases. *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1235 (11th Cir. 2020). The Seventh Circuit has echoed this criticism. *See Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014) ("We are skeptical about the second of these steps . . . .").

possess certain forms of identification to cast a ballot violated § 2 because minorities "are less likely to possess the forms of identification required" by the statute. *Id.* The Ninth Circuit rejected this argument because the plaintiffs "produced no evidence supporting this allegation" and "adduced no evidence that Latinos' ability or inability to obtain or possess identification for voting purposes (whether or not interacting with the history of discrimination and racially polarized voting) resulted in" less opportunity for minorities. *Id.*

Likewise, in *Hood*, the court rejected a § 2 challenge to the placement of early-voting locations. 351 F. Supp. 2d at 1336. There, the plaintiffs sought a court order requiring election officials to open additional early-voting sites, arguing that the current number of early-voting sites inconvenienced African American voters. *Id.* at 1335. The court disagreed because the plaintiffs failed to establish causation. *Id.* ("[O]n the evidence currently presented to the Court, it is impossible to say how the placement of early voting sites . . . affect African-American voters."). The court also provided a separation-of-powers rationale for refusing to indulge the plaintiffs' request, stating that it lacked "the authority to order the opening of additional sites based merely on the convenience of voters." *Id.*

Here, Plaintiff has similarly failed to present any evidence showing that the lack of an OREV site caused a discriminatory result. *See Yazzie*, 2020 WL 5834757, at *4 ("As Navajo voters have access to several voting options that allow them to turn in their ballots . . . Plaintiffs have not shown a disparate burden."). Specifically, Plaintiff has not presented evidence that a *single* Tribal Member has been unable to vote since the OREV site was discontinued in 2016. As Dr. Trende's declaration states, there is little evidence that removal of the OREV in Precinct 110 is associated with a decrease in overall turnout. (Ex. B, Trende Decl. at ¶¶ 50-51). Dr. Trende also found that early voting has rarely been used on the Pascua Yaqui Reservation at any time. (*Id.* at ¶ 48-49). In fact, in 2014, it was in the single digits. (*Id.*). In addition, Dr. Trende found no evidence that the removal of the OREV site after 2016 dissuaded voters from voting. (*Id.* at ¶ 52). Put simply, the data shows that removing the OREV site had *no impact* on Tribal Members' voting patterns. Plaintiff's § 2 claim thus fails at step one because it cannot show that the challenged practice, the lack of

an OREV site, caused "a discriminatory result." See Gonzalez, 677 F.3d at 405.

The "evidence" Plaintiff offers does not change this result. Plaintiff claims that the lack of an OREV site causes a disparate impact because other areas of Pima County have not lost early voting sites; it is difficult for Native American voters to travel "any distance as compared to whites"; the COVID-19 pandemic "exacerbate[s]" the burdens of travel; and these alleged burdens are unique to Native American voters. (Doc. 13 at 14-15). Courts require much more than this. Compare Veasey v. Abbott, 830 F.3d 216, 250-51 (5th Cir. 2016) (plaintiffs presented evidence that Latino and Black voters were 195% and 305% more likely than white voters to lack legally compliant voter ID). Like the plaintiffs' claims in Hood, Plaintiff's arguments do not establish causation; they merely speak to Tribal members' alleged inconvenience in casting an early ballot, which is not actionable under § 2. See Hood, 351 F. Supp. 2d at 1335; see also Lee v. Va. State Bd. of Elections, 843 F.3d 592, 600 (4th Cir. 2016) (§ 2 does *not* prohibit "any regulation that imposes a disparate inconvenience," and polling places do not "need to be precisely located such that no group ha[s] to spend more time traveling to vote than . . . any other"); Yazzie, 2020 WL 5834757, at *4 (a showing that an election law is "more inconvenient for Navajo voters than it is for certain voters" does not constitute an "adequate showing of a disparate burden" under § 2).

Moreover, Plaintiff's claim that the COVID-19 pandemic "exacerbate[s]" the alleged burden is belied by the fact that more early ballots were cast in Precinct 110 during Arizona's August 4, 2020 primary—which occurred at the peak of Arizona's battle against the pandemic—than during the 2016 primary. (Compare Doc. 16-1 at 3 with Doc. 16-4 at 4). Further, Plaintiff's attempt to compare the inconvenience of voting on the Pascua Yaqui reservation, a rural area, to urban areas like Tucson and its suburbs is unavailing because they have failed to show that the distance they must travel to access an early-voting site "is any more severe than other rural parts of Arizona." Yazzie, 2020 WL 5834757, at * 4. Accordingly, Plaintiff offers no evidence, quantitative or otherwise, to establish the requisite causal connection between the challenged voting practice and a discriminatory result. Its § 2 claim fails at step one. See Hobbs, 948 F.3d at 1012.

### 2. Plaintiffs fail to establish the presence of Senate Factors.

Because Plaintiffs have not made the required showing at step one, the Court need not analyze the Senate Factors. Should the Court reach them, however, they do not help.

The Ninth Circuit considers the nine Senate Factors at step two of its analysis. *Hobbs*, 948 F.3d at 1013 (citing S. Rep. No. 97-417 and *Gingles*, 478 U.S. at 36-37). A showing of causation is also required at step two, as the challenger must show that "the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 638 (6th Cir. 2016) (emphasis in original).

Here, Plaintiffs do not even bother to present evidence concerning four of the nine factors, thus conceding that they are not at issue or do not support their claims. (*See* Doc. 13 at 16-19). Specifically, they present no evidence that voting in a relevant political subdivision is polarized (second factor); that members of Native American tribes have been denied access to the candidate slating process (fourth factor); that racial appeals have been used in a relevant campaign (sixth factor); or that Native Americans have not been elected to public office (seventh factor).[4] *See id.* Indeed, many Native American candidates *have* been elected to public office and appointed to important positions, including the federal bench. (Ex. C, Critchlow Decl. at ¶¶ 49-50).

Of the limited Senate Factors that Plaintiff does address, the rebuttal expert report prepared by Dr. Critchlow shows how Plaintiff's analysis is incomplete at best and fails to establish the requisite causal connection between lack of an OREV and "social and historical conditions." (*See id.* at ¶¶ 10-11, 16, 60, 66); *see also Husted*, 834 F.3d at 638. Plaintiff's examples of historical voting-related discrimination (first factor) are not contemporary and ignore positive trends in minority voting (including mail-in voting), turnout, and consideration of minority interests in the redistricting process. (*See id.* at ¶¶ 34-

---

[4] Plaintiff claims that alleged burdens on their rights "depress turnout among Native American voters." (Doc. 13 at 18). But again, as Dr. Trende's report shows, this statement is contradict by the data. (Ex. B at ¶¶ 50-51).

- 9 -

59, 64-65). Plaintiff's claim that Recorder Rodriguez's voting practices and procedures burden Native American voters (third factor) overlooks the significant voter-outreach efforts Recorder Rodriguez and other state officials have made on Native American reservations. (Ex. A at ¶¶ 23-25, 56); (Ex. C. at 44); (Doc. 16-5). Plaintiff's analysis of the extent to which Native Americans bear the effects of past socioeconomic discrimination (fifth factor) again fails to establish a causal connection between historical discrimination against the Tribe and any alleged burden on their voting rights—including the lack of an OREV site. (*See* Ex. C at ¶¶ 10-11, 16, 60, 66).

Finally, responsiveness to the needs of minorities (eighth factor) is shown in Arizona by a series of legislative enactments, including the redistricting process, the Arizona Taxpayer and Citizen Protection Act, and Proposition 202. (*See id*. at ¶¶ 34-48, 61). The only "evidence" Plaintiff presents on the eighth factor—that Recorder Rodriguez did not accede to their current litigation demands, (Doc. 13 at 18)—merely shows that the she will not establish a low demand, unsecured, and non-ADA-compliant early voting site simply because a party asks her to do so.[5] It has no relevance to whether Recorder Rodriguez is responsive to the needs of minorities. And, contrary to Plaintiff's assertions, Recorder Rodriguez *did* endeavor to accommodate Plaintiff's last-minute request to open an OREV site. (Ex. A ¶¶ 54-57). But Plaintiff was unable to point to a site with the requisite security and ADA-compliant infrastructure during the time period when early voting planning was underway. (*Id*. at 43-44, 54-57). Indeed, Plaintiff did not even bother to participate in the early- and emergency-vote-planning processes. (*Id*. at ¶¶ 43-44). Thus, Plaintiff fails at both steps of the § 2 analysis.[6] See *Mark Wandering Med. v. McCulloch*, 906 F. Supp. 2d 1083,

---

[5] As discussed below, *infra* Part I.D., Recorder Rodriguez's interests in election security and ensuring election sites are ADA compliant are compelling, not "tenuous."

[6] In one last grasp at straws, Plaintiff makes the outlandish suggestion that Recorder Rodriguez—a woman of color—harbors "racial animus" against Native Americans. (Doc. 13 at 18-19). This unsupported attempt to impugn Recorder Rodriguez's character hardly merits a response. Suffice it to say that Plaintiff takes Recorder Rodriguez's statements out of context—and narrates them for added effect—to conjure a racist boogeyman where none exists. Surely, if Plaintiff had some real evidence of racial animus, it would have brought a claim under the § 2 "intent test." *See, e.g.*, *Hobbs*, 948 F.3d at 1038.

1092 (D. Mont. 2012) (applying Senate Factors and holding that state was not required state to establish additional early voting locations in Native-American-majority areas).

### E. The Absence of an OREV Site Does Not Burden the Right to Vote.

Assuming *Anderson-Burdick* is the applicable standard,[7] Plaintiff's undue burden claim still fails. Under the two-part *Anderson-Burdick* framework, courts "must first consider the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate." *Short*, 893 F.3d at 676 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). If the asserted injury fails to demonstrate any burden, then "there is no reason to call on the State to justify its practice." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 732 n.12 (9th Cir. 2015). Under this "balancing and means-end fit framework," the severity of the burden dictates the level of review required: if the burden is not severe, a state need only identify an important regulatory interest to justify a reasonable, non-discriminatory restriction. *See Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Burdick*, 504 U.S. at 434).

More specifically, courts have "routinely rejected" the argument that "a long commute or a wait in line" constitutes "a significant harm to a constitutional right." *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020); *see also Hood*, 351 F. Supp. 2d at 1335. Similarly, voters are not entitled to have "every polling place . . . be precisely located such that no group had to spend more time traveling to vote than did any other." *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601, 606 (4th Cir. 2016); *see also Valenti v. Ind. Sec'y of State*, No. 1:15-cv-1304-

---

[7] Citing *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 810 (1969), the Fifth Circuit recently opined that rational-basis scrutiny—not *Anderson-Burdick*—may apply to all government regulations that impact early voting, so long as those regulations do not "preclude" voting by other methods. *See Tex. League of United Latin Am. Citizens v. Hughes*, ---F.3d---, 2020 WL 6023310, at *5 n.6 (5th Cir. Oct. 12, 2020) (mem.) ("[T]here is force to the argument that *McDonald* applies with equal rigor to early voting as it does to absentee voting—after all, both forms of voting are affirmative accommodations offered by the state and designed to make voting more available . . . .").

WTL-MPB, 2017 WL 4310192, at *2 (S.D. Ind. 2017) (holding that the burden on plaintiff of having to drive nine miles farther to vote was "very minimal").

Here, as discussed above, *supra* Part I.D.1., all of Plaintiff's allegedly "severe" burdens are devoid of statistical support and essentially boil down to inconvenience. Moreover, Recorder Rodriguez has the statutory discretion to establish or not establish early voting locations. Under Ariz. Rev. Stat. § 16-542(A), a county recorder "*may* establish on-site early voting locations at the office of the county recorder" and "*may* also establish any other early voting locations in the county" that she "deems necessary." When a county recorder exercises this authority to establish an early-voting site, she does not abridge the right to vote; she expands it. See *Hughs*, 2020 WL 6023310, at *5. And, critically, "a law that makes it *easier* for others to vote does not abridge any person's right to vote." *Id.* (quoting *Texas Democratic Party v. Abbott*, ---F.3d---, 2020 WL 5422917, at *15 (5th Cir. Sept. 10, 2020)). The fact that Recorder Rodriguez has established early-voting locations in other places—making it easier for voters in other precincts to cast a ballot—does not burden Plaintiff's Tribal Members' right to vote. See *id.* Absent such a burden, "there is no reason to call on" Recorder Rodriguez "to justify [her] practice." *Reagan*, 798 F.3d at 732 n.12.

Regardless, the governmental interests in placement of early-voting sites are legitimate and compelling. At least three significant, governmental interests are at play here. *First*, Recorder Rodriguez's decision was based, in large part, on the need to conserve limited election resources, which is a legitimate interest. *See, e.g.*, *Cross v. Fong Eu*, 430 F. Supp. 1036, 1042 (N.D. Cal. 1977) (conserving election resources is "clearly . . . a legitimate governmental interest"). As Dr. Jim Gimpel's report explains, the location of Pima County's early voting sites since at least 2006 has tracked demand for early voting, not racial animus or insensitivity. (Ex. D, Gimpel Decl. at 7-9). Turnout in Precinct 110 was a "record low" in 2016, whereas other precincts where early-voting sites were subsequently added had much higher turnout (i.e. demand). (*Id.* at 3-5). Consistent with this, the original OREV site was discontinued, in part, because only 44 total voters used the site *over an entire week*. (Ex. A at ¶ 25). Only 29 of those voters resided in precinct 110. (*Id.* at ¶ 29).

Because the precinct covers more than the Reservation, the number of Tribal Members who actually utilized the OREV site was potentially fewer than 29. (*See* Doc. 13-3 at 14); (Ex. A at ¶ 29).

Plaintiff contends that the Secretary of State can provide Recorder Rodriguez with the resources she needs to establish an OREV site. (Doc. 13 at 22-23). That is incorrect. In the midst of the pandemic, election resources such as poll workers are even more scarce because many poll workers have declined to work during the pandemic. (Doc. 13-3 at 45); (Ex. A at ¶ 50). Indeed, as of September 3, 2020, Recorder Rodriguez still needed to find 60 additional workers just to staff *existing* polling locations, and training during the pandemic is very difficult due to social distancing requirements. (Doc. 13-3 at 45); (Ex. A at ¶¶ 50-51). Requiring Recorder Rodriguez to find, train, and deploy poll workers to a new early-voting site with historically low demand would place an immense burden on her office, regardless of whether she is eventually reimbursed by the Secretary. (Ex. A. at ¶ 50). At this late hour, it would also be impossible for Recorder Rodriguez to provide pre-printed ballots at an OREV site. (*Id.* at ¶ 49). Pre-printed ballots are generally made available at all early-voting sites for provisional voters and to serve a back-up in the event a network crash disables ballot printers. (*Id.* at ¶ 20). Simply put, Recorder Rodriguez does not have the resources to establish a new early voting site on the eve of the General Election.

*Second*, the decision not to establish an OREV site for the 2020 General Election is directly related to the compelling governmental interests in election integrity and "ensuring that an individual's right to vote is not undermined by fraud in the election process." *Burson v. Freeman*, 504 U.S. 191, 199 (1992); *see Purcell*, 549 U.S. at 4 (interest in preserving integrity of elections is "compelling"). In the wake of attempted foreign interference in the 2016 election, Recorder Rodriguez, spurred by Department of Homeland Security guidance, placed a renewed emphasis on election security. (Doc. 13-3 at 43); (Ex. A. at ¶ 31). As part of this, she reevaluated existing facilities for security issues. (Doc. 13-3 at 43); (*Id.*). The previous OREV site posed numerous unacceptable security risks, including: (1) its reliance on a wireless network connection instead of a more secure hardwired connection

(which all county buildings have, including Mission Library); and (2) the fact that physical ballots were not secured (ballots were instead stored each night in a utility closet). (Doc. 13-3 at 51); (Ex. A at ¶ 22).

None of the on-reservation facilities offered by Plaintiff were viable alternatives, including the Tribal Chambers and the late-identified Azul Room in the Tribe's Wellness Building. On October 7, 2020, for example, counsel for the Recorder's Office noticed that the Azul Room is slated to serve as an Election Day polling location. (*Id.* at ¶ 54). On October 9, 2020, Deputy County Recorder Christopher Roads decided to visit the Azul Room to determine whether it theoretically could be suitable for use as an early voting site. That inspection revealed a number of deficiencies. For example, there were at least five to six doors and a kitchen shed that needed to be rekeyed, and the proposed room for storing election AV equipment was unsecure. (*Id.* at ¶ 56). While these issues could potentially be remedied for future elections, they cannot be corrected in time for the Azul Room to serve as an OREV site for the 2020 General Election. (*Id.* at ¶ 57). This is exactly why attempting to revise election administration plans via the judiciary *during* an election is fraught with potential problems and should not be allowed under the *Purcell* doctrine.

Plaintiff downplays the physical security concerns, arguing that the Azul Room must be secure because it will be used for Election Day voting. (Doc. 13 at 21). But this argument ignores a critical distinction between early voting and Election Day voting: on Election Day, ballots and equipment are not stored overnight. (Ex. A at ¶¶ 17, 47). Overnight ballot storage necessitates fully-secured access points, which the Azul Room lacks. (*Id.* at ¶ 47). Thus, Recorder Rodriguez's decision to not have an OREV site in the 2020 General Election served the compelling interests of preventing fraud and ensuring election integrity.

*Third*, Recorder Rodriguez's decision not to establish an OREV site at a facility that fails to comply with the ADA also serves the government's compelling interest in complying with federal and state anti-discrimination laws. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 518 (2006) (Scalia, J., concurring in judgment); *Johnson v. Mortham*, 915 F. Supp. 1529, 1552 (N.D. Fla. 1995) ("[T]he Court may assume that

compliance with federal antidiscrimination laws is a compelling state interest."). To date, Plaintiff has not presented Recorder Rodriguez with *any* potential OREV site that is ADA-compliant. (Ex. A at ¶ 57). The Azul Room, for example, had automatic wheelchair buttons that were not operational, and the distance from the parking lot to the proposed voting room is significant. (*Id.* at ¶ 56). These issues might be mitigated by increased staffing on Election Day, but the same resources are not available at early-voting sites. Thus, Plaintiff's demand on Recorder Rodriguez to establish an OREV site placed her in an impossible position: establish a non-ADA-compliant early voting site with no effective resources or face this lawsuit. The former choice may have exposed her to liability under the ADA. *See, e.g., United Spinal Ass'n v. Bd. of Elections in City of N.Y.*, 882 F. Supp. 2d 615, 624 (S.D.N.Y. 2012) (collecting cases where courts have found ADA violations in the voting context). Her decision not to accede to Plaintiff's demand ensured compliance with the ADA and that persons with disabilities have meaningful access to all Pima County polling locations.

Put simply, Recorder Rodriguez's interests easily outweigh the non-existent or minimal burden on Plaintiff's rights. *See Reagan*, 798 F.3d at 732 n.12.

## II. Plaintiff Has Not Suffered Irreparable Harm.

Plaintiff's likelihood of success on the merits is extremely low, which raises its threshold requirement for showing irreparable harm. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005). Plaintiff must demonstrate not only that irreparable harm is "possible" without an injunction, but that it is "likely." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter*, 555 U.S. at 22). "Speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

Plaintiff claims it will suffer irreparable harm because "numerous" Native American voters will be unable to cast ballots. (Doc. 13 at 23-24). As discussed above, Plaintiff has not shown that *any* Native American voter will be unable to vote due to the absence of an OREV site. In any event, the alleged harm is completely within voters' own control to avoid. Voting in-person at an early-voting location in Arizona is a choice, not a requirement. In

addition to voting early in-person, voters on the Pascua Yaqui Reservation can vote by mail, request a special election board visit their residence, or cast a ballot at the on-reservation polling location on Election Day. *See* A.R.S. § 16-541; § 16-549 (Doc. 13-4 at 31). These readily available alternatives make Plaintiff's alleged harm speculative at best.

Furthermore, Plaintiff completely fails to consider other alternatives that *it* may take alleviate the alleged hardship. For example, Plaintiff could utilize its own funding, seek Arizona Secretary of State funding, seek federal funding, or coordinate with a non-profit organization to operate a service that could assist in transporting voters the eight miles to the library. Plaintiff could also undertake outreach and marketing to ensure voters do not delay in making the necessary arrangements – while they are shopping, picking up mail, or undertaking other daily functions outside of the Reservation – to visit the library and engage in the opportunity to vote. Plaintiff is silent on any such efforts.

### III. The Balance of Equities and Public Interest Tip Sharply in Favor of Defendant.

When the government is a party to a lawsuit, the Ninth Circuit "consider[s] the balance of equities and the public interest together." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). "Courts should be extremely cautious about issuing a preliminary injunction" when the injunction "goes beyond maintaining the status quo" and should not grant such relief "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1441 (9th Cir. 1986) (internal citation and quotations omitted). Plaintiff's burden is heightened here because "election cases are different from ordinary injunction cases" and "[i]nterference with impending elections is extraordinary." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

Here, the balance of equities and the public interest tip decidedly in favor of Recorder Rodriguez and the need to maintain adherence to the orderly election administration plan that has already been adopted. As the Supreme Court recognized in *Purcell* and its progeny, issuing injunctions on the eve of an election causes voter confusion and harms the orderly administration of the election. And, as discussed above, Plaintiff's requested relief would place an immense burden on Recorder Rodriguez, requiring her to hire staff, make

significant changes to facilities, and order unobtainable equipment on an impossible deadline. All this, when members of the Pascua Yaqui Tribe could avoid any "harm" to themselves by casting a vote-by-mail ballot, casting a ballot at a nearby early voting location, requesting a special election board, or casting a ballot at the on-reservation polling location on Election Day. For all these reasons, Plaintiff cannot establish that the balance of equities and public interest favor a preliminary injunction.

## Conclusion

Granting Plaintiff's Motion less than three weeks before the November 3, 2020 General Election, with voting already well underway, would threaten the orderly administration of Pima County's electoral process, contrary to *Purcell*. Even without *Purcell*, Plaintiffs still would not be entitled to a preliminary injunction because all four preliminary injunction factors weigh against them. This Court should deny the Motion.

Dated this 15th day of October, 2020.

SNELL & WILMER L.L.P.

By: s/ *Eric H. Spencer*
Eric H. Spencer
Brett W. Johnson
Colin P. Ahler
Ryan J. Regula
Derek C. Flint
*Attorneys for Defendant F. Ann. Rodriguez*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2020 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record in this matter.

*s/Nicole Begazo*