Danielle Lang *(Pro Hac Vice)*
Jonathan Diaz *(Pro Hac Vice)*
Aseem Mulji *(Pro Hac Vice)*
Valencia Richardson *(Pro Hac Vice Pending)*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
dlang@campaignlegal.org
jdiaz@campaignlegal.org
amulji@campaignlegal.org
vrichardson@campaignlegal.org

Patty Ferguson-Bohnee, 020996
Indian Legal Clinic
Arizona State University
Sandra Day O'Connor College of Law
111 East Taylor Street
Mail Code 8820
Phoenix, Arizona 85004
Telephone: (480) 727-0420
pafergus@asu.edu

Mary R. O'Grady, 011434
Joshua D. Bendor, 031908
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012
Telephone: (602) 640-9000
mogrady@omlaw.com
jbendor@omlaw.com

Attorneys for Pascua Yaqui Tribe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| Pascua Yaqui Tribe,<br><br>Plaintiff,<br><br>vs.<br><br>F. Ann Rodriguez, in her official capacity as Pima County Recorder,<br><br>Defendant. | Case No. 4:20-cv-00432-JAS<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff submits this reply to support its Emergency Motion for Preliminary Injunction.

## I.   The Tribe Has Standing to Sue on Behalf of Its Members.

The Pascua Yaqui Tribe can bring this lawsuit claiming either *parens patriae* or associational standing on behalf of its members. Defendant's suggestion that the Tribe—a sovereign entity—lacks the legal authority to bring a suit to vindicate the constitutional rights of its members is simply the latest example of her lack of respect for the Pascua Yaqui Tribe and its members' concerns.

### a.   *The Pascua Yaqui Tribe has established* parens patriae *standing*.

For *parens patriae* standing, a Tribe "must meet both the basic requirements of Article III standing and the unique requirements of that doctrine." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017) (internal quotation omitted). Article III standing requires Plaintiffs demonstrate: "(1) a concrete and particularized injury that is 'actual or imminent, not conjectural or hypothetical'; (2) a causal connection between the injury and the defendant's challenged conduct; and (3) a likelihood that a favorable decision will redress that injury." *Pyramid Lake Paiute Tribe of Indians v. Nevada, Dep't of Wildlife,* 724 F.3d 1181, 1187-88 (9th Cir. 2013). The doctrine of *parens patriae* additionally requires the sovereign plaintiff to articulate a quasi-sovereign interest at stake. *See id* at 651-52; *see also Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258 (1972).

The Supreme Court has explained that a sovereign's quasi-sovereign interests "fall into two general categories . . . [(1)] the health and well-being—both physical and economic—of its residents in general . . . [and (2)] not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). The Court further explained that a sovereign has standing to sue as *parens patriae* if a "sufficiently substantial segment of its population" is injured by the challenged conduct. *Id.* Thus far, the Court has not drawn

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"definitive limits on the proportion of the population of the [sovereign] that must be adversely affected" but made it clear it should not be solely "an identifiable group of individual residents" and "the indirect effects of the injury must be considered as well." *Id.*

Several Circuits—including the Ninth Circuit—have recognized that Native American tribes may assert *parens patriae* standing. *See, e.g.*, *Confederated Tribes of the Chehalis Reservation v. Thurston Cty. Bd. of Equalization*, 724 F.3d 1153 (9th Cir. 2013); *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 610 (8th Cir. 2018); *Cheyenne and Arapaho Tribes v. First Bank & Trust Co.*, 560 Fed. App'x. 699, 703-04 (10th Cir. 2014). The Supreme Court has also recognized that *parens patriae* standing is not limited to states. *See Alfred L. Snapp*, 458 U.S. at 607-08 n. 15 (finding Puerto Rico had "a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State.").

The Pascua Yaqui Tribe properly invokes *parens patriae* standing here. The Recorder's refusal to provide equal access to early voting on the Pascua Yaqui Reservation causes a concrete and imminent injury to Yaqui voters by imposing a racially disparate and unconstitutional burden on their right to vote, which can be redressed by the Defendant. Moreover, the Defendant's decision to deny the Reservation an early voting site injures the Tribe's quasi-sovereign interests by denying the benefits of the federal system to its population by imposing barriers to voting that disproportionately affect tribal members.

The burden on the Tribe's members' right to vote is neither speculative nor theoretical. Plaintiff has submitted numerous declarations from its members detailing the precise burdens that the Recorder's deliberate inaction has erected between them and the ballot box—burdens which disproportionately affect members of the Pascua Yaqui Tribe—and are both traceable to and redressable by Defendant. *See* Doc. 4-5 at

4-38 (Exs. 20-28). In its Complaint, Doc. 1, the Tribe also made specific allegations that the Pascua Yaqui Tribe has been disproportionately affected by the COVID-19 pandemic, ¶ 22, has the lowest rate of vote by mail use in Pima County, ¶ 26, and primarily resides on a reservation that is a two-to-three-hour bus ride from the nearest early voting site, ¶ 62. These allegations, compounded with the evidence Plaintiff submitted in support of its Motion for Preliminary Injunction, *see, e.g.,* Doc. 4-4 (Ex. 18, Dietrich Decl.), further demonstrate the burdens imposed by the lack of an early in-person voting site on the Reservation.

As Plaintiff's evidence submitted in support of its Motion for Preliminary Injunction demonstrates, Defendant's refusal to reestablish an early in-person voting site on the Reservation makes participation in the election difficult, if not impossible, for many Yaqui voters—particularly because of the social and economic conditions of the Pascua Yaqui Tribe specifically and Native Americans generally in Pima County and given the circumstances of COVID-19. When the Tribe's members' efforts to vote are frustrated, its political power is diminished and its ability to advocate for tribal needs is diluted. When a law makes it more difficult for members of minority groups to vote, members of those groups are discriminatorily denied "the benefits that are to flow from participation in the federal system." *Alfred L. Snapp*, 458 U.S. at 608. The Pascua Yaqui Tribe "ha[s] an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population." *Id.* at 607-08. That interest sustains the Tribe's standing to sue as *parens patriae*.

Defendant's arguments to the contrary are meritless. Defendant contends that the Pascua Yaqui Tribe lacks *parens patriae* standing because it is allegedly suing on behalf of some, but not all, of its members. Defendant notes that some Native American voters in Pima County "do trust the [vote by mail] system or utilize other methods of

4

voting" other than early in-person voting, and that not every resident of the Pascua Yaqui Reservation lacks access to private transportation. Doc. 17 at 5-7. True enough. But under Defendant's articulation of the *parens patriae* doctrine, the Tribe would be powerless to assert a claim under that theory unless *every single one* of its members was harmed by the challenged conduct. This is far too narrow a view of the law and facts.

The Supreme Court made clear in *Alfred L. Snapp* that there is no requirement that *all* members of the relevant population be directly harmed in order for *parens patriae* standing to exist. *Alfred L. Snapp*, 548 U.S. at 607. In that case, the Supreme Court held that Puerto Rico had *parens patriae* standing notwithstanding the fact that a relatively small number of individuals were directly harmed by the alleged violation of federal law—in that case, only "some 787 out of a total population of close to 3 million." *Id.* at 599. The Court found that a "narrow" focus on the number of directly affected individuals was inappropriate, because the "sting" of discrimination is felt beyond those it most directly affects. *Id.* at 609. Thus, sovereigns—like the Pascua Yaqui Tribe—have a strong "interest in securing residents from the harmful effects of discrimination." *Id.*

In this case, a substantially larger proportion of tribal members are directly affected than was sufficient to establish *parens patriae* standing in *Alfred L. Snapp*. And the harms flowing from discrimination against Native Americans in voting are arguably greater—and more widespread—than the employment discrimination at stake in that case. The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Additionally, "any racial discrimination in voting is too much." *Shelby Cty. v. Holder*, 570 U.S. 529, 557 (2013). Here, where Defendant is alleged to have enacted a policy that unconstitutionally burdens tribal members' right to vote and imposes an electoral

system with discriminatory results, *see* Compl. ¶¶ 87-100, such discrimination directly impairs the right to vote of a substantial segment of tribal members and indirectly affects the rest of the Tribe's members. *See Reynolds v. Sims,* 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.").

Defendant's assertion that "all" members must be directly affected for *parens patriae* standing ignores *Alfred L. Snapp* and instead relies on lower court cases (which themselves fail to discuss or cite *Alfred L. Snapp*). *See* Doc. 17 at 5-7. Defendant's reliance on these cases is misplaced not only because they ignore binding precedent, but also because they are not comparable to this case. Several of Defendant's cited cases involved narrow claims on behalf of particular individuals. *See Navajo Nation v. Superior Court of State of Wash. for Yakima Cty.*, 47 F. Supp. 2d 1233 (E.D. Wash. 1999) (denying *parens patriae* standing to tribe in a case about adoption proceedings involving one child who was not a tribal resident); *Kickapoo Traditional Tribe of Tex. v. Chacon*, 46 F. Supp. 2d 644 (W.D. Tex. 1999) (denying *parens patriae* standing to tribe seeking to assert First Amendment claim on behalf of "a small group of tribe members"); *Alabama & Coushatta Tribes of Tex. v. Trustees of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319, 1327 (E.D. Tex. 1993) (denying *parens patriae* standing to tribe's claim challenging school hair restriction on behalf of 10 students in school district). The others dealt with tribes' attempts to assert *parens patriae* standing on behalf of non-enrolled members when summary judgment decisions had "significantly narrowed the number" of Native Americans affected by the challenged law. *Assiniboine & Sioux Tribes v. State of Mont.*, 568 F. Supp. 269 (D. Mont. 1983), or only on behalf of certain individuals who were members of both the plaintiff tribe and a second tribe not involved in the litigation, *Kickapoo Tribe of Okla. v. Lujan*, 728 F. Supp. 791, 795

(D.D.C. 1990). The factual scenarios in the cases Defendant cites are clearly distinguishable from the instant case, where the Pascua Yaqui Tribe is bringing a case on behalf of a substantial segment of its population, vastly larger than what the Supreme Court found sufficient in *Alfred L. Snapp* and far greater than the number of individuals identified as being directly affected in *Navajo Nation*, *Chacon*, or *Alabama & Coushatta Tribes of Texas*. Likewise, the Tribe's claims have not been limited to clearly defined subgroup of tribal members, as in *Lujan*, or non-enrolled individuals, as in *Assiniboine & Sioux Tribes*.

Regardless, even on their own terms, those cases do not stand for the proposition that "all" members of the Tribe must be *directly* harmed. Rather, they make the point that a *parens patriae* action must be made "on behalf of the collective interests of all its citizens." *Navajo Nation*, 47 F. Supp. 2d at 1244; *Lujan*, 728 F. Supp. at 795. That must be understood in light of the Supreme Court's holding that *parens patriae* standing lies when the number of directly and indirectly affected individuals represent a "sufficiently substantial" segment of the population. *Alfred L. Snapp*, 458 U.S. at 607. In those cases, a sovereign *is* raising a claim "on behalf of the interest of all its citizens," *U.S. v. Santee Sioux Tribe of Nebraska*, 254 F.3d 728 (8th Cir. 2001), because the interests of all its citizens is served when the sovereign acts for the collective good.

This is especially so in the context of voting; even if a particular tribal member's ability to vote is not directly affected by the challenged law, her ability to effectively associate with other like-minded tribal members and thereby elect mutual candidates of choice is lessened when a substantial portion of the tribal members are directly affected by the law. In any event, to the extent that Defendant contends that these lower court decisions require literally every member be directly harmed in order for the tribe to assert *parens patriae* standing, then Defendant also asks this Court to interpret those decisions as directly contravening binding Supreme Court precedent. The Pascua Yaqui

7

Tribe has alleged facts that more than sufficiently satisfy the population requirements outlined in *Alfred L. Snapp*.

> ### b. The Pascua Yaqui Tribe has established associational standing.

A tribe may sue on its members' behalf under associational standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Oklevueha Native American Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 839 (9th Cir. 2012) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

As explained *supra*, contrary to Defendant's assertion that Plaintiff "does not identify a single specific member who suffered an injury-in-fact that is traceable to Recorder Rodriguez's alleged unlawful conduct and is likely to be redressed by a favorable decision," Doc. 17 at 8, the Tribe has identified multiple individual members whose right to vote is burdened by the decision to close and refusal to reinstate an early voting site on the reservation, who have experienced reduced opportunities to access the ballot relative to their non-Native American counterparts in Pima County, and whose injuries are both traceable to and redressable by the Defendant. *See generally,* Doc. 4-5 (Ex. 22, 25). Because Pascua Yaqui voters are reluctant to vote by mail due to a historic lack of trust in the mail voting system, many tribal members prefer to vote in-person. *See id.* (Doc. 4-5, Ex. 22 ¶ 11; Doc. 4-5, Ex. 25 ¶ 7). But requiring tribal residents to vote in large numbers at a single polling place on Election Day presents hazards for the public health of Yaqui voters and the Tribe as a whole. *Id.* (Doc. 4-5, Ex. 20 ¶¶ 7-16; Doc. 4-5, Ex. 27 ¶¶ 5-8). Thus, to avoid dangerous overcrowding on Election Day, residents must have ready access to in-person early voting, without which

many Yaqui voters may be unable to vote at all. *See, e.g., id.* (Doc. 4-5, Ex. 25 ¶¶ 19-20).

Defendant's reliance on *Yazzie v. Hobbs*, in which the Ninth Circuit denied relief based on "speculative injury," is misplaced. In *Yazzie*, the Plaintiffs "fail[ed] to make a clear showing of a concrete and particularized injury," and made no "particularized allegation with respect to any of the six individual plaintiffs." 2020 WL 6072861, at *2 (9th Cir. Oct. 15, 2020).[1] The *Yazzie* plaintiffs submitted no evidence or showing as to "whether any of the plaintiffs intend to vote in this general election, and if so, whether they intend to vote by mail," and no specific evidence pertaining to any of the individual plaintiffs and their respective hardships or how those hardships would affect their ability to vote in the 2020 election. *Id.* In the instant case, Plaintiff has submitted declarations highlighting specific impacts of COVID-19 on the Pascua Yaqui Reservation and members, (Doc. 4-5 Ex. 20; Ex. 24), and burdens imposed on individual Pascua Yaqui voters in the absence of an early voting site, (Doc. 4-5 Ex. 22; Ex. 25; Ex. 27; Ex. 28).

Defendant also argues that the risks presented by COVID-19 are "speculative injuries [which] are not the kind of 'concrete' and 'imminent' injuries that form the basis of an Article III action." This misses the point. Plaintiffs do not allege that COVID-19 is the source of their injury, but rather that Defendant's failure to establish an in-person early voting site on the Pascua Yaqui Reservation, as applied in the context of the ongoing global pandemic, imposes an undue burden on tribal members' right to vote. *See, e.g., Miller v. Thurston*, 967 F.3d 727, 735 (8th Cir. 2020) (rejecting Arkansas's argument that plaintiffs' injuries were traceable to COVID-19 rather than

---

[1] *Yazzie* is further distinguishable because the Navajo Nation "distanced itself from the suit," thus, unlike the instant case, there were no broader tribal interests at stake in *Yazzie*.

1

2

the State's enforcement of the challenged initiative petition statute, which plaintiffs challenged as-applied during the pandemic).

Finally, Defendant's assertion that the Tribe has failed to demonstrate that its stated interest is germane to the organization's purpose is easily refuted by the evidence. As a sovereign, federally-recognized tribe, Plaintiff has a demonstrated interest in protecting the constitutional rights of its members and ensuring that they are able to participate in the political process on equal terms with non-Native American voters. The Tribe "conducts voter registration, education, and outreach to Tribal voters to encourage them to participate in local, state, and federal elections," using "Tribal staff to register Tribal members to vote in county, state, and federal elections . . . encourage voters to turn out to vote on election day . . . [and] educate people about the importance of voting in state and federal elections." Doc. 4-5 (Ex. 26, ¶ 5). The Tribe has also engaged in advocacy, not only with the Defendant, but also with the Pima County Board of Supervisors, to expand access to early voting for tribal members. Doc. 4-5 (Ex. 26, ¶¶ 9-24). When an organization's "activities are centered on voter education and registration," and those activities are "directly related to the individual members' interests" in having access to voting opportunities on an equal, nondiscriminatory basis, such activities are sufficient to demonstrate that the organization's interests are germane to its purpose. *See Olagues v. Russoniello*, 770 F.2d 791, 799 (9th Cir. 1985).

Because the Tribe has alleged injuries on behalf of its members and seeks to vindicate interests germane to its purpose, it has associational standing in this case.

## II. *Purcell* Does Not Bar This Court from Providing Long-Requested Relief for the Tribe.

Defendant's invocation of *Purcell* is improper here. *Purcell* does not serve to block all election-related litigation in the run up to an election, but instead entreats courts to assess the circumstances of the challenged procedure at issue in light of the pending election. *See Purcell v. Gonzalez,* 549 U.S. 1, 4, (2006) (noting the court's

10

requirements to make considerations "specific to election cases"); *see also Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 368 (9th Cir. 2016) (explaining certain factors which a court may consider under *Purcell*). A district court does not offend *Purcell* when it narrowly tailors its injunction to the circumstances at issue without altering existing election laws or rules, especially if procedures are not yet finalized. *See Democracy North Carolina v. N. Carolina State Bd. of Elections*, No. 1:20CV457, 2020 WL 4484063, at *63 (M.D.N.C. Aug. 4, 2020); *Hill v. Williams*, No. 16-CV-02627-CMA, 2016 WL 8667798, at *8 (D. Colo. Nov. 4, 2016). In fact, other jurisdictions continue to enter into narrowly tailored, election-related agreements before the November 3, 2020, election. *E.g., Blackfeet Nation v. Corey Stapleton, et al*, No. 4:20-cv-00095-DLC (Oct. 14, 2020) (entering into a settlement agreement to operate a satellite election office on a reservation within five days of the agreement).

Here, the primary concerns noted in *Purcell* are not present. *See id.* at 4. As in *Democracy North Carolina* and *Hill*, an injunction from this Court would not alter existing rules, cause confusion, or burden the integrity of the election. *Democracy North Carolina,* at *63; *Hill* at *8. Rather, an injunction would require the Defendant to use the resources already at her disposal, under existing Arizona procedures, to provide some form of early voting before the election while there is still time to spare. The Defendant may still request full reimbursement for all expenses related to implementing an early voting location at the site that has *already been approved* by the Pima County Elections Department before the last week of early voting begins on October 26, 2020. *See* ECF 4-4 at 12; Dul Decl., ¶¶ 3-5.[2] The Secretary of State will provide the necessary supplies upon request. *Id.* Furthermore, the Defendant's concerns

---

[2] To the extent that there are any concerns regarding accessibility, the Tribe has already offered to mitigate that concern by providing an additional resting area between the Tribal Wellness Center and the parking lot. *See* Ex. 33 at 1 (correspondence with counsel).

11

can be addressed by alternative means. The Defendant could provide a limited-use site on the Reservation, as she did in the many years prior to eliminating that location, ECF 4-3 at 50; could provide ballot drop off locations on the Reservation, Dul Decl., ¶ 12; or could request a mobile voting unit for the Reservation, eliminating the accessibility and security concerns proffered by the Defendant. The Secretary of State has confirmed that a mobile voting unit could still be available in time if the Defendant so requested. Dul Decl., ¶ 15.

Defendant has time to reinstate the early voting location on the Pascua Yaqui Reservation, as evidenced by her actions and that of her counterparts in other counties. While as early as September 1, 2020 Defendant stated that it was too late to provide a secure voting site, ECF 4-3 at 40, ¶ 13, Defendant nevertheless engaged in talks with the Tribe through counsel as late as October 9, 2020 to discuss the possibility of operating an early voting site at the Tribe's Wellness Center. *See* Ex. 33 (correspondence between counsel). Other counties also continue to finalize their plans for early in-person voting.[3]

Second, Defendant's concerns about timing are self-inflicted. The Tribe made continued good faith attempts to work with Defendant on this issue and only sought judicial relief as a last resort. ECF 1, ¶ 2; ECF 4 at 5-10. Since 2018, the Tribe has

---

[3] Coconino County approved polling locations just last week. *See* Notice of Regular Session and Executive Session of the Coconino County Board of Supervisors at 109, (Oct. 6, 2020), https://www.coconino.az.gov/AgendaCenter/ViewFile/Agenda/_10062020-2648.
Apache County accepted a grant on October 14, 2020 to operate ballot drop boxes, drive-thru voting, and other election administration needs. *See* Notice of Special Public Meeting and Agenda of the Apache County Board of Supervisors at 4, (Oct. 15, 2020), https://tb2cdn.schoolwebmasters.com/accnt_591117/site_591118/Documents/October-15-2020-Backup-Agenda.pdf. Apache County only received approval for its Election Day polling locations on October 6, 2020. Notice of Public Meeting and Agenda of the Apache County Board of Supervisors, (Oct. 6, 2020), https://tb2cdn.schoolwebmasters.com/accnt_591117/site_591118/Documents/October-6-2020-Agenda.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

consistently written correspondence and attended public hearings, gaining public support and the support of the Mayor of Tucson and the Pima County Board of Supervisors—to which the Defendant has responded, and despite the Defendant's allegation that the Tribe's "fail[ed] to participate in the political process." ECF 18 at 4. The Tribe only filed this action after the Defendant refused to engage further with the Tribe, ECF 4-4 at 2, and only after the Tribe, through counsel, put the Defendant on notice about the unlawful nature of her steadfast refusal to provide equal access to early voting to the Tribe. ECF 4-4 at 53. That the Tribe chose to engage in political advocacy rather than filing this case "years ago" is not a defense for the Defendant's failure to respond. ECF 18 at 5. "The Court [should] not punish Plaintiffs for their decision to try other governmental channels before seeking judicial redress given that Plaintiffs filed suit in a timely fashion once other channels partial 'came up dry.'" *Jacksonville Coal. For Voter Prot. v. Hood,* 351 F. Supp. 2d 1326, 1332 (M.D. Fla. 2004). *Purcell* is not a shield with which the Defendant can protect herself from her own procrastination, especially when the injuries in question may yet be corrected. Indeed, *Purcell* compels the Court to balance the timing of the election against the "strong interest in exercising the fundamental . . . right to vote." 549 U.S. 1 at 4 (internal quotation marks omitted).

In reality, Defendant has provided an ever-shifting narrative that placed the Tribe in an impossible position.[4] *Cf. Hood*, 351 F. Supp. 2d at 1332 (outlining the plaintiff's extensive advocacy efforts to implement an early voting site before finally

---

[4] The Supreme Court has held that state actors may not rely on shifting rationales to justify speech restrictions in the First Amendment context. *See Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 26 (1st Cir. 2020) (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988). Likewise, in the voting context, the fact that the government's "principal reasons" for its actions "shifted over time . . . suggest[] that those reasons may be pretextual." *Veasey v. Abbott*, 830 F.3d 216, 240-41 (5th Cir. 2016) (citing *Foster v. Chatman*, 136 S.Ct. 1737, 1751-52, 1754-55 (2016)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

resorting to litigation at a late hour). The Defendant represented to the Tribe that she would limit limited-service early voting and expand full-service early voting "wherever possible." ECF 4-3 at 4. Then, she allowed limited-service early voting to remain at the Ajo location, despite closing limited-service voting locations on both the Pascua Yaqui and Tohono O'odham Reservations. Defendant represented that only County-owned sites would be operational, *id.,* but then established an early voting and emergency voting site at the Good Shepherd UCC Church in Sahuarita, Arizona. ECF 1 at ¶ 76. The Defendant represented that the state only pays a "flat per voter" reimbursement for establishing early voting facilities, ECF 4-3 at 52, but the Office of the Secretary of State offered to fully reimburse and directly pay expenses related to early voting in tribal and rural areas as early as July 27, 2020. ECF 4-4 at 12; Dul Decl. ¶¶ 11-13. The Tribe has employed every advocacy tool at its disposal, and Defendant may not abuse *Purcell* to absolve herself of her responsibilities under Arizona law, the Voting Rights Act, and the Constitution.

**III.    This Court Should Reject Defendant's Attempt to Assert Laches.**

The Tribe's claims are not barred by laches. Defendant Rodriguez has failed to demonstrate unreasonable delay by the Tribe and prejudice caused by any alleged delay. To the contrary, Defendant caused needless delay in the filing of the instant suit, while continuing to violate the Tribe's rights. Defendant Rodriguez cannot now use the delay in filing that she requested as a reason for this Court to conclude the Tribe's claims are barred by laches.

Laches applies where a plaintiff "unreasonably delays in filing a suit and as a result harms the defendant." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002). "To demonstrate laches, a party must establish '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Apache Survival Coal. v. United States*, 21 F.3d 895, 905 (9th Cir. 1994)

14

(quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)). To determine whether a plaintiff exhibited a lack of diligence and unreasonably delayed filing a lawsuit, courts assess "the length of delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action." *Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 838 (9th Cir. 2002). Courts also consider "whether the plaintiff has proffered a legitimate excuse for its delay." *Id.*

Defendant Rodriguez has failed to demonstrate a "lack of diligence" by the Tribe that would warrant the application of laches. *Kansas v. Colorado*, 514 U.S. 673, 687 (1995). The Recorder argues that the Tribe had a "two-year timeframe" during which it could have filed a suit, starting from July 18, 2018. ECF 17 ("Br.") at 13. Defendant Rodriguez fails to mention, however, that over the course of those two years the Tribe diligently exhausted all other avenues to resolving this issue short of litigation. As detailed in Plaintiff's Preliminary Injunction Motion, the Tribe made repeated requests to Defendant Rodriguez to re-establish an early voting site on the Reservation starting in July 2018. *See* ECF 13 ("PI Br.") at 6-8. The Tribe also wrote to the Pima County Board of Supervisors in August 2020, requesting the establishment of an early voting site, an emergency voting site, and a ballot drop-off location. ECF 4-5 (Ex. 26, Yucupicio Decl.) at ¶ 20; ECF 4-3 (Ex. 6). And, in response to the Tribe's efforts, the Board passed a resolution on September 15, 2020, authorizing the Recorder to make early voting and mail ballot drop-off available at the Pascua Yaqui Tribal Council Chambers. ECF 4-3 (Ex. 9). The Board resolution also authorized the Recorder to establish emergency voting at that location. *Id.* As soon as it became clear Defendant Rodriguez was not going to take action despite these efforts and the Board's support, the Tribe filed the instant lawsuit.

Defendant Rodriguez is nonresponsive to these facts and has failed to explain how the Tribe's continuous efforts to vindicate its rights over the last two years amount

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to a "lack of diligence" by the Tribe. *Kansas*, 514 U.S. at 687. Instead, Defendant Rodriguez asks this Court to "punish [the Tribe] for [its] decision to try other governmental channels before seeking judicial redress." *Hood*, 351 F. Supp. 2d at 1332. This Court should reject Defendant's argument and hold that the Tribe "filed suit in a timely fashion once other channels . . . came up dry." *Id.* (internal quotation marks omitted).

Moreover, Defendant Rodriguez herself caused needless delay in the filing of this lawsuit. On September 25, 2020, the Tribe sent a legal demand letter, through its attorneys, to Defendant Rodriguez to establish an early and emergency voting site and a ballot drop-off location on the Reservation. ECF 4-4 (Ex. 17). The Tribe requested a response to its demand letter by October 7. From October 7 through October 11, Defendant Rodriguez's counsel asked the Tribe to refrain from filing the instant suit and expressed optimism about using the Azul Room in the Tribal Wellness Center as an early voting site. ECF 4-5 (Ex. 29, Diaz Decl.) at ¶ 6; Ex. 33 The Tribe's decision to delay filing this lawsuit based on Defendant Rodriguez's own requests for time to investigate a potential early voting site is a "legitimate" reason for delay. *Jarrow Formulas, Inc.*, 304 F.3d at 838; *see also Hood*, 351 F. Supp. 2d at 1332 (holding plaintiffs' motion for preliminary injunction timely filed even though "early voting [was] almost half over," because the reason plaintiffs delayed filing was that they were attempting to "reach[] an amicable solution without engaging the judicial branch of government"). Defendant Rodriguez cannot now use the delay that she asked for as an argument for why laches should bar the Tribe's claims.

The Recorder's argument that "[a]t least four primary, special, and general elections" have occurred since she eliminated the early voting site on the Reservation is also unavailing. Br. at 13. The Ninth Circuit has held that claims under the Voting Rights Act and Equal Protection Clause are not barred by laches even when multiple

election cycles have passed, provided that the violation is "ongoing." *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990). In *Garza*, the plaintiffs were challenging intentional discrimination in redistricting that was implemented in 1981. The county argued that "because four rounds of elections [had] occurred since the 1981 reapportionment plan was instituted . . . the plaintiffs' claim for redistricting relief is barred on the ground of laches." *Id.* at 772. The Ninth Circuit held that although the plaintiffs "could have filed an action as early as 1981 . . . , their failure to do so [did] not constitute laches" because the violation of their rights was "ongoing." *Id.*; *see also Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1143-44 (E.D. Cal. 2018) (rejecting laches defense "because plaintiffs have demonstrated an ongoing violation of § 2 of the Voting Rights Act" based on *Garza*). Here, Defendant Rodriguez's violation of the Tribe's rights under Section 2 of the Voting Rights Act and the Equal Protection Clause is "ongoing." *Garza*, 918 F.2d at 772; *see* PI Br. at 12-25. Laches therefore does not bar the Tribe's claims.

Additionally, just as in *Garza*, "the injury [the Tribe] suffered at the time [the violation of their rights began] has been getting progressively worse." 918 F.2d at 772. The pandemic has exacerbated the disparate burden on tribal members' right to vote. *See* PI Br. at 16. Indeed, in light of the grave health risks posed by the pandemic, the Secretary of State has encouraged counties to provide early, in-person voting sites "particularly in rural and tribal communities that have historically faced barriers to voting by mail" to reduce crowds. ECF 4-3 (Ex. 2) at 4. Now more than ever, Defendant Rodriguez's refusal to reinstate any early in-person voting, emergency voting, or mail ballot drop-off locations on the Reservation has a severely disparate impact on Native American voters in Pima County. Where the injury at issue is not only "ongoing," but also "getting progressively worse," as it is here, the plaintiff's claim "ought not be barred by laches." *Garza*, 918 F.2d at 772.

1

2    Defendant Rodriguez has also failed to satisfy her burden under the second

3    requirement for a laches defense: prejudice. *See Danjaq LLC v. Sony Corp.*, 263 F.3d

4    942, 955 (9th Cir. 2001). Where the defendant does not contend "evidentiary prejudice"

5    occurred, the defendant typically must show "it took actions or suffered consequences

     that it would not have, had the plaintiff brought suit promptly." *Id.*

6
          Defendant Rodriguez's argument that she "will assuredly be prejudiced if this
7
     suit were to continue" misstates the standard for a laches defense. Br. at 14. Defendant
8
     must show that the Tribe's alleged *delay* in filing the suit prejudiced her—not that the
9
     continuation of the lawsuit will. *See id.*; *see also Morgan*, 536 U.S. at 121 (laches
10
     applies only where the plaintiff "unreasonably delays in filing a suit and as a result
11
     harms the defendant"). Thus, whether this suit "will undoubtedly distract" the Recorder
12
     from her other work is irrelevant to the laches prejudice analysis. Br. at 14.
13
          Indeed, Defendant Rodriguez does not contend that the Tribe's alleged delay in
14
     filing this suit has prejudiced her, nor could she. As discussed earlier, Rodriguez herself,
15
     through counsel, communicated that it is still feasible to set up an early voting site at
16
     the Azul Room in the Tribal Wellness Center as recently as October 8. Ex. 33 at 6-8.
17
     Other election officials in Arizona have also confirmed that "it is not too late for
18
     counties to request the Secretary's support in leasing mobile early voting units for the
19
     last week of the early voting period." Ex. 32, Dul Decl. ¶ 15; *see also Blackfeet Nation*,
20
     No. 4:20-cv-00095-DLC (Oct. 14, 2020) (entering into a settlement agreement to
21
     operate a satellite election office on a reservation within five days of agreement). And
22
     the Board and Secretary have pledged to provide the resources necessary to set up an
23
     early voting site, emergency voting site, or ballot drop-off locations on the Reservation.
24
     Ex. 9; Dul Decl. ¶¶ 7-13.5 Moreover, if Defendant Rodriguez wanted to avoid the need
25

26
     _____

27   5 Even if Defendant Rodriguez had alleged she will "suffer[] consequences that [she]
     would not have, had the plaintiff brought suit promptly," *id.*, courts have held that
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

for "late stage" changes, ECF 18 at 2, she could have taken action at any time during the last two years to comply with the Tribe's requests—as the Secretary and Board have authorized and encouraged her to do, and as federal law and the Constitution require. This Court should reject Defendant Rodriguez's attempt to assert the defense of laches and hold the Recorder accountable for her ongoing violation of the Tribe's rights.

**IV.    Plaintiff is likely to succeed on their claim under Section 2 of the VRA.**

Plaintiff is likely to succeed on its Section 2 vote-denial claim under the two-step analysis used by the Ninth Circuit and most other courts. *See Hobbs*, 948 F.3d at 1012 (citing *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012)). Relying upon specific evidence, Plaintiff has shown first that Defendant's closure of the Reservation's early voting site causes a disparate burden on Yaqui voters, and second that the closure interacts with social and historical conditions to deprive Yaqui voters of an equal opportunity to participate in the political process. *See id.* at 1012. Defendant's assertions to the contrary lack merit.

> a.  *Plaintiff has presented abundant evidence that the closure of the Reservation's early voting site causes a disparate and discriminatory impact on Yaqui voters.*

Defendant first contends that Plaintiff has "fail[ed] to present *any* evidence" showing a causal link between the Recorder's closure of the only early voting site on the Reservation and a prohibited discriminatory result. ECF 18 at 6 (emphasis added). This is simply not true.

Indeed, to show disparate burden, a plaintiff must present "proof of [the] causal connection between the challenged voting practice and a prohibited discriminatory result." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (internal quotations

---

"unexpected resource allocation and expenditures" incurred by election officials in altering their plans to protect voters' rights "is not sufficient [prejudice] to warrant denying injunctive relief." *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1242 (M.D. Fla. 2012).

omitted). Plaintiffs have proven, *with evidence*, that Defendant's decision to shutter the Reservation's only in-person early voting site in 2018 *causes* a disparate burden on Yaqui voters' access to early voting sites—as shown by expert analysis, ECF 4-4 (Dietrich Decl.), various documentary evidence, and declarations from Yaqui voters who face high barriers to early in-person voting, s*ee, e.g.*, ECF 4-5 (Ex. 22, Hendricks Decl.) at 12, ¶¶ 4-5, 10-12; ECF 4-5 (Ex. 25, Morillo Decl.) at 25, ¶¶ 6-10; ECF 4-5 (Ex. 27, Manuel Decl.) at 35, ¶¶ 3, 6, 11.

Defendant relies on cases that bear no resemblance to the robust evidentiary record here. This case is nothing like *Gonzalez*, for example, where plaintiffs offered *no* evidence to show that "Latinos, among other ethnic groups, are less likely to possess the forms of identification required" by the challenged statute, and therefore failed to show disparate impact. *Id.* at 406 (emphasis added). Here, Plaintiff's expert has presented analysis showing that Yaqui voters, among other ethnic groups, are more distant from early voting sites in absolute terms, and are less likely to have the resources to travel to their nearest early voting site. *See* ECF 4-4 (Dietrich Decl.) at 69-77. Yaqui voters are three to four times more distant from early voting sites than whiter areas of the region, *id.* at 9, 13, and face relative barriers to access such as lower rates of car access, more limited public transportation resulting in 2-to-3-hour transit times, higher poverty levels, greater danger from COVID-19, and a long history of discrimination in voting. *Id.* at 72-79; ECF 4-5 (Ex. 20, Renteria Decl.) at 5, ¶¶ 14-16. *See Spirit Lake Tribe v. Benson Cty., N.D.*, No. 2:10-CV-095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010) (granting preliminary injunction on a tribe's Section 2 claim challenging polling place closures where the tribe presented evidence that its members would lack access to polling places due to a relative lack of private and public transportation, high poverty rates, and lack of ability to pay for transportation to the nearest site).

1

2    Nor can Defendant claim to rely on *Hood*, 351 F. Supp. 2d 1326. In that case,

3    plaintiffs failed to obtain a preliminary injunction in a Section 2 challenge alleging that

4    five early voting sites were insufficient in Duval County compared to other Florida

5    counties that had more sites and fewer African-American registered voters. *Id.* at 1336.

6    The court concluded that plaintiffs failed to prove disparate impact because four of the

7    five early voting sites were located in predominantly African-American neighborhoods.

8    *Id.* at 1334. And plaintiffs could not show whether early voting sites in the comparator

9    counties were in African-American or non-minority areas. *Id.* at 1335. No such

10   evidentiary uncertainty exists here. Defendant removed the *only* early voting site on the

11   Pascua Yaqui Reservation, ECF 4-5 (Ex. 28, Lewis Decl.) at 37, ¶ 5, and three of four

12   sites on the Tohono O'odham Reservation, leaving only one early voting site on the

13   vast amount of tribal land in Pima County. ECF 4-5 (Ex. 19, Lopez Decl.) at 2, ¶¶ 9-

14   10; Ex. 16 at 12-13; Ex. 4 at 5. Plaintiff has also shown that other early voting sites in

15   Pima County, as comparators, are clustered in non-Native or predominantly white

16   neighborhoods. *See, e.g.*, ECF 4-4(Dietrich Decl.) at 71-72; Ex. 12 at 3-4. Defendant's

17   action has created a "glaring hole in coverage" for Yaqui voters' access to early voting.
     ECF 4-4 (Dietrich Decl.) at 63.[6]

18   Defendant next argues that Plaintiffs' "'evidence'" is insufficient. ECF 18 at 8

19   (quotation marks in original). Defendant does not dispute the fact that whiter areas of

20   the city have gained early voting site at the expense of Yaqui voters nor that Yaqui

21   voters face greater burdens in traveling to early voting sites. *Id.* Instead, relying on

22   *Hood*, Defendant dismisses the severe disparate burden faced by Yaqui voters in

23

24   —————————————

25   [6] Defendant suggests that the burden on Yaqui voters should be compared in severity
     to "other rural parts [sic] of Arizona," ECF 18 at 8 (quoting *Yazzie v. Hobbs*, No. CV-
26   20-08222-PCT-GMS, 2020 WL 5834757, at *3 (D. Ariz. Sept. 25, 2020)). But the
     Reservation is part of the Tucson metropolitan area and is near non-Native areas, whose
27   residents have far better access to early voting sites. ECF 4-4 Dietrich Decl. at 62, 78.

28

accessing early voting sites as mere "inconvenience in casting an early ballot." *Id.* But what was deemed an "inconvenience" in *Hood*, 351 F. Supp. 2d at 1335—driving 25 minutes to wait 20 minutes at an early voting site—hardly compares to the prospect faced by Yaqui voters of traveling on multiple buses for 2-3 hours roundtrip, in this year amid pandemic. Defendant similarly dismisses COVID-19 concerns of Yaqui voters without acknowledging myriad evidence showing that Yaqui voters are at far greater risk than other groups in Pima County. *See, e.g.*, ECF 4-5 (Ex. 20, Renteria Decl.) at 5, ¶¶ 14-16; *see also* Pl.'s Mot. at 4-5. The disparate impact of early voting site closures on Yaqui voters is not unactionable as mere inconvenience.

Finally, Defendant claims that Plaintiffs cannot prove a causal link to a discriminatory result because the shuttering of the Reservation's early voting site had "no impact on Tribal voting patterns," ECF 18 at 7, relying on a declaration of Mr. Trende, ECF 20-2 (Ex. B). But Section 2 does not require a showing of lower turnout. *Veasey v. Abbott*, 830 F.3d 216, 260–61 (5th Cir. 2016) (noting that a requirement to show turnout reduction "would unmoor the Voting Rights Act from its history and decades of well-established interpretations about its protections"). And Mr. Trende's declaration itself shows that early voting in Precinct 110 *dramatically* decreased shortly after Defendant shuttered the Reservation's early voting site, from 28 voters in 2016 to 3 voters in 2018, and fewer votes were cast in 2018 overall than in 2016. *Id.* ¶ 48. And for all its emphasis on "empirical testing from real-world data," Mr. Trende's declaration fails to consider certain "real-world" facts about the closure that continue to bear on Yaqui turnout today. First, Defendant's closure of the early voting site just before the 2018 primary interrupted the Tribe's significant get-out-the-vote effort to increase voter turnout overall and via early voting, which is reflected in low early voting numbers in 2018. *See* ECF 4-5 (Ex. 28, Lewis Decl.) at 37, ¶¶ 4-5. Second, Defendants ignore specific evidence that early voting numbers would likely increase

dramatically this year due to the Tribe's get-out-the-vote efforts and because Yaqui voters are rightfully concerned about contracting and spreading COVID-19. In the most recent tribal council elections, the Tribe held 11 days of early voting on the Reservation. According to the Chairman of the Tribe's Board of Elections, turnout increased significantly from 2016 to 2020, and early voting numbers on the Reservation jumped from 161 early voters in 2016 to 454 early voters in 2020. ECF 4-5 (Ex. 23, Gallardo Decl.) at 16-17, ¶¶ 9-12.

Plaintiff has presented more than sufficient evidence to establish disparate impact on Yaqui voters, caused by Defendant's actions.

> b. *Under the totality of circumstances, the closure of the Reservation's early voting site deprives Yaqui voters of equal opportunity to participate in the political process.*

Plaintiff has also made the required showing at the second step of the Section 2 analysis. The totality-of-circumstances analysis is guided by the Senate Factors; however, "Congress did not intend this list to be comprehensive or exclusive, nor did it intend that 'any particular number of factors be proved, or that a majority of them point one way or the other." *Farrakhan v. Washington*, 338 F.3d 1009, 1015 (9th Cir. 2003) (citing S. Rep. No. 97-417, at 28-29); *see Smith v. Salt River Project Agr. Imp. & Power Dist.*, 109 F.3d 586, 591 (9th Cir. 1997) ("This examination is intensely fact-based and localized."). The crux of the inquiry is whether there is a "legally significant relationship between the disparate burden on [Yaqui] voters and the social and historical conditions affecting them." *Hobbs*, 948 F.3d at 1012. Plaintiff has proven that the closure of early voting on the Reservation interacts with social and historical conditions to deprive its members of equal opportunity to participate in the political process. *See* PI Br. at 16-19.

Defendant's first claim regarding the totality of circumstances is that Plaintiffs should consider "positive trends in minority voting," as outlined by Defendant's third expert declarant, Dr. Critchlow. ECF 18, at 9, ECF 20-3 (Ex. C). But even Dr. Critchlow

admits throughout his historical account, that progress on racial equality has been "gradual" and "uneven." ECF 20-3 (Ex. C, Critchlow Decl.) at ¶¶ 15-16. And as explained by Dr. Dietrich, the long history of discrimination against Native Americans, including Yaquis, in Arizona is has been painstakingly documented and is not ancient history: "[t]he lingering effects of that racism continue to reverberate throughout state and local government." ECF 4-4 (Dietrich Decl.) at 81. With respect to present-day discrimination, Dr. Dietrich recounts the severe disparities in health, educational attainment, economic security, and employment that continue to plague Yaqui voters, and traces that roots of these inequities back to the same history of racism that put Arizona under federal preclearance under Section 5 of the Voting Rights Act. *Id.* at 81. The history of discrimination and present-day discrimination endured by Native Americans and Yaquis both weigh strongly in Plaintiffs' favor.

Regarding voting practices and procedures that burden minority voters, Defendant does not dispute that early voting sites on tribal lands, even when they were available in 2016, were open for far fewer hours than non-county-owned sites in other neighborhoods. Instead, Defendant points to "significant voter-outreach efforts," ECF 18 at 10, by state officials and the Recorder's office. For this proposition, Defendant cites a single paragraph in Dr. Critchlow's report describing a single election of a Navajo Supervisor and redistricting efforts in other counties, *id.* ECF 20-3 (Ex. C), in addition to a description of the Recorder's office's minimal efforts to stock paper ballots for Yaqui voters at the old Reservation early voting site that was ultimately scrapped, *id.* ECF 20-1 (Ex. A). This factor also weighs strongly in Plaintiff's favor. Finally, Defendant attempts to recast the Reporter's repeated refusals to reinstate early voting on the Reservation as evidence of responsiveness, but as described above, supra Section [laches?], Defendant has not been responsive to the Tribe's many efforts to secure accessible early voting for its members.

24

In sum, Defendants attempts to reframe the social and historical circumstances of Yaqui voters in its favor are unavailing. The totality of circumstances confirms that Defendant's removal of the only early voting site on the Reservation denies Yaqui voters, members of a protected class, equal opportunity to participate in the political process, and therefore violates Section 2 of the Voting Rights Act.

**V.    The Failure to Place an Early Voting Location—or Even a Ballot Drop-Off Location—on the Reservation Fails *Anderson-Burdick*.**

Defendant Rodriguez attempts to cast the discriminatory and severe burdens that Pascua Yaqui voters face due to her stubborn refusal to place any form of early voting or ballot drop-off location on the Reservation as a question of mere "convenience." Such characterizations ignore the evidence, fly in the face of the unprecedented circumstances of the COVID-19 crisis, and repeat the dismissive tone Defendant Rodriguez has repeatedly taken in response to the Tribe's real concerns about equal voting access for tribal members. Moreover, Defendant Rodriguez's shifting rationales for her refusal to place any early voting opportunities on the Reservation cannot withstand the slightest scrutiny.

**A.    Defendant Rodriguez Improperly Characterizes the Anderson-Burdick Inquiry.**

Defendant Rodriguez misunderstands the *Anderson-Burdick* test and cites overruled precedent. Defendant Rodriguez asserts that where Plaintiffs do not establish a sufficient burden, "there is no reason to call on the State to justify its practice." Opp. at 11, 12 (citing *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 732 n. 12 (9th Cir. 2015)). But as Defendant is surely aware, that portion of *Arizona Libertarian Party* relied upon the test established in *Libertarian Party of Wash. v. Munro,* 31 F.3d 759, 761–62 (9th Cir.1994), which has been explicitly overturned by the Ninth Circuit. *See Public Integrity Alliance v. City of Tucson,* 836 F.3d 1019, 1025 (9th Cir. 2016). As *Public Integrity Alliance* clarified: "*Burdick* calls for neither rational basis review nor burden shifting." *Id.*; *see also Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018)

("Permitting a state to justify any non-severe voting regulation with a merely 'speculative concern of voter confusion,' would convert Anderson/Burdick's means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe. We have already rejected such an approach." (internal citations omitted)). Under *Burdick* and *Public Integrity*, this Court must apply a "means-end fit framework" that looks at the burdens imposed by the Recorder's choice and determines whether the justifications she puts forth are sufficient to outweigh those burdens. *Id.* at 1024.[7] They are not.

Defendant Rodriguez likewise ignores the component of *Anderson-Burdick* framework that not only considers the severity of the burden on voters but whether those burdens discriminate. *See Burdick*, 504 U.S. 428, 434 (1992) (holding that only "reasonable, *nondiscriminatory* restrictions" fall within the category of restrictions that ordinarily will pass muster). As the Sixth Circuit explained in *Obama for America v. Husted*, where a challenged restriction falls disparately on a group of voters—as

---

[7] Defendant Rodriguez also attempts to argue that *Anderson-Burdick* may not apply to early voting access, relying on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 810 (1969). *McDonald* is about absentee voting, as compared to in-person voting. Defendant Rodriguez's attempt to stretch it to cover everything but Election Day voting is untenable. But in any event, subsequent Supreme Court has abrogated the broad interpretation of *McDonald* that Defendant suggests. *See Goosby v. Osser*, 409 U.S. 512, 521 (1973) (declining to follow *McDonald*); *O'Brien v. Skinner*, 414 U.S. 524, 529, 531 (1974) (again declining to follow *McDonald* and holding that it "rested on failure of proof" rather than absence of a right to equal protection); *Am. Party of Tex. v. White*, 415 U.S. 767 (1974) (abandoning *McDonald*'s reasoning and finding that minor party voters had a right to vote absentee in their primary where that right had been extended to major party voters, notwithstanding that minor party voters had the alternative option to vote in-person); *see also Tex. Democratic Party v. Abbott*, 2020 WL 5422917 at *17 (5th Cir. Sep. 10, 2020) (noting the prior motions panel's failure to wrestle with *Am. Party* in relying on *McDonald*). Indeed, *McDonald* was decided before *Anderson v. Celebrezze* and presumes a world where courts may only apply either a strict scrutiny or rational basis test. *See McDonald*, 394 U.S. at 809 (discussing only a rational basis test). But the subsequent development of the *Anderson/Burdick* framework rejected *McDonald*'s dichotomy, creating the intermediate range of burden. Under *Public Integrity Alliance*, the Ninth Circuit has made clear that the *Anderson-Burdick* framework is appropriate for all burden on the right to vote cases.

26

1

2    Recorder Rodriguez's decision does, *see supra* __—the government must justify *both*

3    the burden on the voters and the disparate treatment of those voters. 697 F.3d 423 (6th

4    Cir. 2012) (holding that the State's justifications would be sufficient to support a

5    nondiscriminatory cutback of early voting but insufficient to justify the unequal cutback

6    of early voting); *see also League of Women Voters of Florida v. Detzner*, 314 F. Supp.

7    3d 1205, 1216-17 ("Disparate impact matters under *Anderson-Burdick*." (citing

8    *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 216 n.18 (2008) (Souter, J.,

9    dissenting) (identifying six-justice majority agreeing that disparate effects across

     identifiable groups matter))).

10          Properly framed, it is clear that *Anderson-Burdick*'s fact-specific means-end

11   framework does not countenance the type of categorical rules that Defendant proposes.

12   For example, Defendant seems to suggest that burdens related to commute times or wait

13   times to vote are categorically minimal and subject to minimal scrutiny. Opp. at 11-12.

14   But, as discussed above, all burdens on the right to vote must be individually assessed

15   and weighed against the government's justifications. And, in this case, Defendant

16   Rodriguez must not only justify the burden but also justify her choice to burden Native

17   American voters in the County in particular by reducing early voting options on the

18   Reservations in Pima County while increasing early voting options elsewhere. Doc 4-4

19   at 86 (Deitrich Decl. at 27).

20          Finally, Defendant also suggests that the burdens placed on Pascua Yaqui voters

21   as a result of her choice of early voting location sites are irrelevant because anytime she

22   creates an early voting site, "she does not abridge the right to vote, she expands it."

23   Opp. at 12. This argument fails on both the facts and the law. On the facts, County

24   Recorders are required—under the Election Procedures Manual, which has the force of

25   law—to use their power to establish early voting sites to "ensure that all voters may

26   reasonably access at least one early voting location." EPM at 64. This is not the law.

27

28                                            27

Even alternative avenues of voting—i.e. early voting and mail voting—are subject to the *Anderson-Burdick* test.[8] *See Obama for America*, 697 F.3d 423 (holding discriminatory cutbacks on early voting unconstitutional under *Anderson-Burdick*); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1325 (11th Cir. 2019) (finding signature matching scheme for mail-in ballots unconstitutional under *Anderson-Burdick*); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 632 (6th Cir. 2016) (holding rules for rejecting absentee ballots unconstitutional under *Anderson-Burdick*); *Price v. New York State Bd. of Elections*, 540 F.3d 101, 112 (2d Cir. 2008) (holding restriction on absentee ballots unconstitutional under *Anderson-Burdick*); *League of Women Voters of Florida*, 314 F. Supp. 3d 1205 (holding limitations on early voting locations unconstitutional under *Anderson-Burdick*).

      B.    *The Failure to Place an Early Voting Location—or Even a Ballot Drop-Off Location—on the Reservation Fails Anderson-Burdick.*

By focusing on categorical assumptions that travel and wait time are mere "inconveniences" and that all early voting sites are "expansions" of the right to vote not subject to constitutional scrutiny, Defendant elides entirely the pandemic circumstances and the evidence of burden on individual voters put forth in Plaintiff's motion and that must form the basis of this Court's fact-specific inquiry. Plaintiff's evidence of burden on Pascua Yaqui voters is uncontroverted. First, Defendant does not and cannot dispute that voting in-person on Election Day raises a severe risk to the health of Pascua Yaqui voters, who are already at higher risk of death or serious illness during the COVID-19 crisis. Second, Defendant does not dispute that the nearest early voting location she has implemented for the 2020 general election will require Pascua Yaqui voters without access to a vehicle to travel two to three hours round-trip by public transportation to

---

[8] This argument is essentially a repackaging of Defendant's reliance on *McDonald*, which fails under current Supreme Court and Ninth Circuit precedent. *See* note 1.

vote early. *Id.* at 6. Nor does she dispute that this burden is dissimilar to the travel burdens faced by white voters in the County.

The only remaining voting option is vote by mail. But once again, Defendant does not dispute that the Reservations has the lowest vote-by-mail rate in Pima County, *id.* at 5, demonstrating that Pascua Yaqui voters have little familiarity with the vote by mail process (which can lead to rejection of one's ballot if the voter makes an error). Moreover, without any drop-off location on the Reservation, vote by mail also requires voters to depend on the U.S. Postal Service to deliver their ballot on time and thus requires voters to cast their ballot far in advance of the election. As the Fifth Circuit *en banc* court has explained, vote by mail is no substitute for in-person voting for many voters:

> Mail-in voting involves a complex procedure that cannot be done at the last minute. It also deprives voters of the help they would normally receive in filling out ballots at the polls . . . . [And] with mail-in voting, voters lose the ability to account for last-minute developments, like candidates dropping out of a primary race, or targeted mailers and other information disseminated right before the election.

*Veasey v. Abbott*, 830 F.3d 216, 255–56 (5th Cir. 2016) (en banc).

None of Defendant Rodriguez's justifications hold water upon scrutiny and certainly cannot justify the substantial and discriminatory burdens Pascua Yaqui voters face. Recorder Rodriguez contends that her choices are justified by "conserv[ation of] limited election resources." ECF 18 at 12. But Defendant has been on notice that the Secretary has funds specifically set aside for expanding Native American voting opportunities and that the Secretary would cover all costs of establish an early voting site, an emergency voting site, and/or a ballot drop off location. *See* Ex. 32 (Dul Decl.). And Defendant's invocation of any "shortage" of poll workers is simply untrue. Indeed, Pima County has seen a record number of poll worker applications and will have approximately *400 hundred* workers on "standby" status, meaning workers that have *already been trained* and can be deployed where needed. *See* Ex. 35 (Taja Davis, *All*

29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Pima County election poll worker spots filled, record number of sign-ups in county*, KGUN ABC9, Oct. 14, 2020, https://www.kgun9.com/rebound/all-pima-county-election-poll-worker-spots-filled-record-number-of-sign-ups-in-county); *see also* Ex. 32 (Dul Decl.) at ¶ 16.

Defendant Rodriguez also invokes the risk of "fraud" and phantom security risks but ignores that she was offered a location with a hardwired internet connection and a room that would be rekeyed so that *only* her staff would have access for storage of equipment and ballots. Ex. 33. Likewise, Defendant Rodriguez's accessibility concerns ignore the facts. The Tribe offered to fix the automatic wheelchair buttons as a condition of locating the early voting site and to set up the very rest areas between the parking and voting site that she says are necessary. *Id.* Moreover, Defendant Rodriguez admits these issues could be "mitigated by increased staffing," Br. at 15, which as described above, is available to her.

Finally, *none* of the shifting rationales provided by Defendant Rodriguez can withstand scrutiny when the Court considers Defendant Rodriguez's failure to operate even a ballot drop-off location and failure to request a mobile early voting units. With respect to ballot drop-off locations, the Recorder is already operating curbside ballot drop-off locations at many of her early voting sites. Such curbside ballot-drop off locations raise *no* security or accessibility concerns and require little to no resources beyond staffing, which the Secretary will fund. *See* Ex. 32 (Dul Decl.) at ¶ 12. Likewise, Recorder Rodriguez could resolve all her concerns by requesting a mobile early voting unity. As the Secretary's elections director has explained:

> The Secretary of State's Office can directly procure mobile early voting units(i.e., large four-window trailers that can serve as secure early voting sites in lieu of fixed buildings).Upon a county's request, we can lease a mobile voting unit, pay for it directly, get the unit delivered and set up in a location and at times of the County Recorder's choosing, and staff the unit with a driver. We can also provide personnel that will assist with ensuring the security of the unit while it is being used for election purposes and/or while it is parked overnight. The trailers come equipped with a power source, tents, tables and chairs for voting, line stanchions

> for assistance with crowd control, and hand washing stations and sanitizer. The county would only need to provide voting materials and staffing to operate the site, but those costs are also fully reimbursable through the AZVoteSafe program.

Ex. 32 (Dul Decl.) at ¶ 11. The Recorder's "justifications" are pretext and certainly cannot outweigh the real and substantial burdens Pascua Yaqui voters face.

## VI.    The Equities Weigh in Plaintiffs' Favor.

Defendant's arguments with respect to the remaining equitable factors are not compelling. Defendant's irreparable harm argument rests entirely on its unsatisfactory merits claims. Unconstitutional burdens on the right to vote are per se irreparable harm. Doc. 4 at 23. Plaintiff's harms—which include the harm of having to expose oneself to unsafe voting conditions during a pandemic—are not "speculative." Moreover, Defendant's suggestion that the Tribe mitigate itself the harms imposed by the Defendant's unconstitutional behavior are both impractical and unmoored from law. Defendant's remaining balance of the equities and public interest arguments merely repeat her unpersuasive invocation of Purcell. The public interest is best served by allowing all eligible voters to have equal opportunity to exercise their fundamental right to vote. Ariz. Democratic Party, 2016 WL 8669978, at *12 ("[B]oth Plaintiff and the public have a strong interest in allowing every registered voter to do so freely.")

## CONCLUSION

For the foregoing reasons and those outlined in their original motion, Plaintiff's motion for a preliminary injunction should be granted.

Dated this 16th day of October, 2020.


                                        OSBORN MALEDON, P.A.

                                        By    s/ Mary R. O'Grady
                                              Mary R. O'Grady
                                              Joshua D. Bendor
                                              2929 North Central Avenue
                                              Suite 2100

Phoenix, Arizona 85012-2793

Danielle Lang
Jonathan Diaz
Aseem Mulji
Valencia Richardson
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005

Patty Ferguson-Bohnee
Indian Legal Clinic
Arizona State University
Sandra Day O'Connor College of
Law
11 East Taylor Street
Mail Code 8820
Phoenix, Arizona 85004

\* Motions for admission *pro hac vice* pending

*Counsel for Plaintiff*

32