IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pascua Yaqui Tribe,<br><br>  Plaintiff,<br><br>v.<br><br>F. Ann Rodriguez, in her official capacity as Pima County Recorder,<br><br>  Defendant. | No. CV-20-00432-TUC-JAS<br><br>**ORDER** |

Pending before the Court is an emergency motion for a preliminary injunction. For the reasons stated below, the motion is denied.[1]

**BACKGROUND**

On October 12, 2020,[2] the Pascua Yaqui Tribe ("Plaintiff" or "Tribe") initiated this action by filing a Complaint seeking declaratory and injunctive relief. On October 13, 2020, Plaintiff filed an emergency motion for a preliminary injunction seeking to compel Defendant F. Ann Rodriguez (in her official capacity as the Pima County Recorder) ("Defendant" or "Recorder") to open an in-person early voting site within the boundaries of the Pascua Yaqui Tribe's Reservation ("Reservation") by no later than October 26, 2020 for the upcoming General Election on November 3, 2020.[3]

---

[1] In addition to her briefing in opposition to the emergency motion, Defendant filed a separate motion to dismiss; the Court will issue a separate Order as to the motion to dismiss at a later date.
[2] October 12 was a federal holiday.
[3] Plaintiff seeks the early voting site from October 26 to October 30, an emergency voting site on October 31 and November 2, and a ballot drop-off site from October 26 to November 2. The primary dispute in this case pertains to the in-person early voting site on

Plaintiff alleges that Defendant's failure to place an in-person early voting site on the Reservation is a violation of the Voting Rights Act. Plaintiff argues that Tribe members have unequal access to in-person early voting sites in Pima County as compared to non-minority communities, and that this unequal access encompasses issues particularly impacting the Tribe such as higher rates of poverty and poor health (diabetes, obesity), fewer transportation options (decreased rates of car ownership and less public transit options), longer distances to in-person early voting sites from the Reservation, and that these issues have been exacerbated during the COVID-19 pandemic.

As the emergency motion filed on October 13 seeks to compel action by October 26, the Court ordered an expedited briefing schedule and an expedited evidentiary hearing schedule. Defendant filed an opposition to Plaintiff's emergency motion on October 15, and Plaintiff filed a reply on October 16. The Court held a status conference with the parties in the afternoon on October 16 (Friday) to discuss issues pertaining to an evidentiary hearing as to Plaintiff's emergency motion; the Court set an evidentiary hearing the next available business days to the extent the Court could clear preexisting hearings to accommodate Plaintiff's emergency motion (i.e., the following Monday and Tuesday).

**THE EVIDENTIARY HEARING**

The Court held an evidentiary hearing with the parties on October 19 and 20. As discussed with the parties at the October 16 status conference, the parties presented live witnesses under oath, and direct, cross, and redirect examination of these witnesses was permitted.[4]

Plaintiff presented five witnesses: (1) Pascua Yaqui Tribe Chairman Peter Yucupicio,[5] (2) Pascua Yaqui Tribe Councilwoman Herminia Frias, (3) Rebekah Lewis,

---

the Reservation and whether this violates Section 2 of the Voting Rights Act; as such, the vast majority of the discussion in this Order focuses on that issue.

[4] Some of the witnesses appeared in-person to offer testimony; however, due to time constraints and geographic distance (out of state witnesses), some of the witnesses had to appear via a video feed to offer their live testimony.

[5] Chairman Yucupicio is the leader of the Tribal Council which is the governing body of the Pascua Yaqui Tribe and Reservation. There are approximately 22,000 members of the Pascua Yaqui Tribe; 7,000 members live on the Reservation, and the other 15,000 members live at locations outside of the Reservation, and in some cases outside of Pima County.

(4) Sambo Dul, and (5) Dr. Joseph Dietrich (an expert witness).

Defendant presented four witnesses: (1) Chief Deputy Pima County Recorder and Registrar of Voters Christopher J. Roads, (2) Dr. James G. Gimpel (an expert witness), (3) Sean P. Trende (an expert witness), and (4) Dr. Donald T. Critchlow (an expert witness).[6]

As these witnesses appeared before the Court, under oath, to offer testimony, and were subject to cross and redirect examination, the Court had the opportunity to assess their credibility in light of all the evidence before the Court.[7] The Court's assessment of the witnesses' testimony included: the opportunity and ability to see or hear or know the things testified to, the clarity of their memories, the manner while testifying, any interest in the outcome of the case, any bias or prejudice, whether other evidence contradicted their testimony, the reasonableness of the testimony in light of all the evidence, and any other factors that impacted their believability. The Court's discussion of the facts and issues in this case incorporates those credibility determinations throughout this Order.

**DISCUSSION**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520

---

[6] Numerous exhibits were admitted into evidence at the evidentiary hearing, and the Court considered the exhibits previously submitted with the parties' briefs. Given the rapid pace at which the parties and this Court were forced to move in light of the emergency motion, the Court provisionally admitted evidence at the evidentiary hearing that would normally be held to a higher evidentiary standard of admissibility; for the same reasons, the objections to evidence made by the parties in writing and at the evidentiary hearing are overruled and the Court has considered the evidence offered by the parties as it pertains to the emergency motion. Many of these written exhibits were sworn declarations; for ease of reference, the Court may refer to these declarants as witnesses, and their written statements as the witnesses' testimony in this Order. The Court notes that Plaintiff's emergency motion urged the Court to issue a ruling by October 20. However, as the evidentiary hearing and closing arguments did not conclude until approximately 6:15 p.m. on October 20, issuing a written Order on October 20 was not feasible. Outside of this particular case, the Court had numerous hearings the week of October 12, and had and still has numerous hearings this week; these previously scheduled hearings could not be moved given the short notice. Nevertheless, the Court has moved as quickly as possible in issuing this Order.

[7] The Court notes that Pima County and Tucson have numerous COVID-19 safety protocols including the wearing of masks when a physical distance of 6 feet can not be continuously maintained between individuals. Likewise, the District of Arizona and this Court mandate the wearing of masks while in the Courthouse and while in the Courtroom, and require physical distancing in Court.

U.S. 968, 972 (1997) (per curiam); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  A plaintiff seeking a preliminary injunction must show that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this serious questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.  Regardless of which standard applies, the movant "has the burden of proof on each element of the test."  *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).  Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff."  *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

This case implicates *Purcell* considerations inasmuch as it directly impacts the administration of early voting by the Recorder that is currently underway throughout Pima County pertaining to the November 3 General Election[8]; the Court has weighed the considerations reflected by *Purcell* and its progeny, and Ninth Circuit authority related thereto in addressing the emergency motion at bar.  *See*, *e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that risk will increase."); *Republican Nat'l Comm. v. Democratic Nat'l*

---

[8]Early voting started on October 7 and continues through October 30.

*Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter rules on the eve of an election."); *Ariz. Democratic Party v. Hobbs*, - F.3d -, 2020 WL 5903488, *2 (9th Cir. Oct. 6, 2020) ("[A]s we rapidly approach the election, the public interest is well served by preserving Arizona's existing election laws, rather than by sending the State scrambling to implement and to administer a new procedure . . . the Supreme Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.") (internal quotes and citations omitted); *Mi Familia Vota v. Hobbs*, - F.3d -, 2020 WL 6044502, *3 (9th Cir. Oct. 13, 2020) (per curiam) ("[P]laintiff-Appellees' extremely late filing relative to [Arizona's deadline to register to vote] is a factor supporting the government's likelihood of success on the merits."); *Yazzie v. Hobbs*, - F.3d -, 2020 WL 6072861, at *4 (9th Cir. Oct. 15, 2020) (per curiam) ("[W]e are mindful that the Supreme Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election . . . The Arizona statute setting election day as the deadline for receipt of ballots has been in effect since 1997 . . . Dismissal of this last-minute challenge to a decades-old rule should be fair notice to plaintiffs who want to tackle the deadline in the future. Accordingly, we affirm the district court's denial of [plaintiff's] request for a preliminary injunction.") (internal quotes and citations omitted)

As a threshold matter, although Plaintiff's emergency motion was filed on October 13, 2020, Plaintiff had notice that there would not be an in-person early voting site on the Reservation in July of 2018. Plaintiff actually had an in-person early voting site at the Tribe's radio station on the Reservation for the 2016 General Election. Due to issues with low voter turnout at that site on the Reservation and additional issues pertaining to increased emphasis on enhanced IT security and on-site security (arising out of the controversy with foreign interference in the 2016 General Election), Defendant decided to find a more suitable location to serve as an in-person early voting site in Pima County ("Early Voting Site"). Plaintiff was informed of Defendant's calculus going into this decision, and ultimately received a formal letter in July of 2018 informing Plaintiff that it

was discontinuing the Early Voting Site on the Reservation. While the parties engaged in a series of informal discussions about bringing back the Early Voting Site to a potentially more suitable location on the Reservation, those discussions ultimately bore no fruit. At the very latest, Plaintiff was on notice that no Early Voting Site would be placed on the Reservation for the 2020 General Election in December of 2019; at that time, Defendant officially announced the specific Early Voting Sites in Pima County, and the Reservation was not included on that list.

The Court notes that Plaintiff argues that it was continuing to informally negotiate with Defendant and her counsel after December of 2019, and that it believed that an informal resolution was achievable up through early October of 2020. While it is commendable that Plaintiff continued to seek and advocate for an informal resolution outside of litigation,[9] at a certain point timely legal action must be taken especially with a rapidly approaching General Election and early voting related thereto. As relevant to this dispute, Arizona will have a total of 25 days of early voting for the 2020 General Election; early voting in Arizona started on October 7, 2020, and continues up through the end of early voting at 5:00 p.m. on October 30, 2020.

As the emergency motion ultimately was not filed until October 13, Plaintiff, Defendant, and the Court have been proceeding at a rapid pace in terms of how litigation typically occurs (even in relation to preliminary injunctions), and this process is not beneficial to the parties, the Court, and the voters of Pima County in reaching a well-informed decision based on extensive periods for discovery, fully briefed motions based on a complete evidentiary record, and an in-depth review of all the evidence and pertinent authority preceding a final written Order.

Although the Court has considered the merits of the parties' positions, the Court's Order (in light of the unique circumstances herein) primarily focuses on factors 2, 3, and 4

---

[9] In September of 2020, for example, the Tribe sought and received a resolution from the Pima County Board of Supervisors authorizing and approving an Early Voting Site on the Reservation. However, as discussed in more detail in this Order, this resolution had no legal effect as the Pima County Recorder is an elected official that does not fall under the authority of the Pima County Board of Supervisors with respect to the establishment of early voting sites and other election related issues.

of the four factors that must be shown for a preliminary injunction, and finds that the extraordinary remedy of a preliminary injunction is unwarranted in this case. All of these factors (i.e., Plaintiff's burden to show that it is likely to suffer irreparable harm without an injunction, the balance of equities tips in its favor, and an injunction is in the public interest) weigh against Plaintiff.[10]  As all of these factors are interconnected under the

---

[10] As referenced above, Plaintiff argues that Defendant's failure to place an in-person early voting location within the boundaries of the Tribe's Reservation violates Section 2 of the Voting Rights Act. Section 2 states in part: "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . A violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(a) and (b) (emphasis in the original). A Section 2 violation may "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991). The Ninth Circuit uses a two-step process in evaluating Section 2 challenges: "First, we ask whether the challenged standard, practice or procedure results in a disparate burden on members of the protected class. That is, we ask whether, as a result of the challenged practice or structure[,] plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice . . . The mere existence—or bare statistical showing—of a disparate impact on a racial minority, in and of itself, is not sufficient . . . Second, if we find at the first step that the challenged practice imposes a disparate burden, we ask whether, under the totality of the circumstances, there is a relationship between the challenged standard, practice, or procedure, on the one hand, and social and historical conditions on the other. The purpose of the second step is to evaluate a disparate burden in its real-world context rather than in the abstract . . . The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives or to participate in the political process . . . To determine at the second step whether there is a legally significant relationship between the disparate burden on minority voters and the social and historical conditions affecting them, we consider, as appropriate, factors such as those laid out in the Senate Report accompanying the 1982 amendments to the VRA." *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1011-13 (9th Cir. 2020) (internal quotes and citations omitted) (the Ninth Circuit stayed its mandate pursuant to Rule 41, Fed. R. App. - *see Democratic Nat'l Comm. v. Hobbs*, Case No. 18-15845 (9th Cir. Feb. 11, 2020) (Order at Doc. 127)), *cert. granted*, (U.S. Oct. 2, 2020) (Nos. 19-1257, 19-1258); *see also Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (as to the "disparate burden" required in step one of the process, "[p]roof of [a] causal connection between the challenged voting practice and a prohibited discriminatory result is crucial.") (internal quotes omitted); *Yazzie v. Hobbs*, 2020 WL 5834757, *2 (D. Ariz. Sept. 25, 2020), *affirmed on other grounds* by *Yazzie*, 2020 WL 6072861 (9th Cir. Oct. 15, 2020) ("If a court finds that the challenged practice results in a disparate burden, the next step is to ask whether, under the totality of the circumstances, there is a relationship between the challenged standard, practice, or procedure, on the one hand, and social and historical conditions on the other . . . This step

circumstances of this case, the Court's discussion of the facts often has bearing on all three factors, and therefore these issues are discussed together throughout this Order.

The Tribe has not shown it will suffer irreparable harm if this Court does not Order the Recorder to establish a last-minute Early Voting Site on the Reservation next week. While Plaintiff argues that it must have an Early Voting Site on the Reservation for the General Election in light of numerous concerns of Tribal members, there is no evidence that any Tribal member on the Reservation will be denied the ability to vote in the General Election without such a site.

While numerous members of the Tribe testified that they preferred to vote in-person at an Early Voting Site on the Reservation, no Tribal member testified that they would be unable to vote without an Early Voting Site on the Reservation. Rather, the testimony reflected that the majority of Tribal members on the Reservation previously signed up for Arizona's Permanent Early Voting List ("PEVL") such that they are automatically mailed a ballot for the 2020 General Election. In Arizona, unlike many other States, one does not need an excuse to receive a ballot by mail and to vote by mail; rather, one merely needs to sign up for the PEVL, or if they have not already signed up for the PEVL, one may still request a mail ballot up until 5:00 p.m. on October 23 for the General Election. Furthermore, the vast majority of Tribal members on the Reservation have a mailbox at their residence, and they regularly receive postal mail service at their respective residence. In addition, the postage for voting by mail in Arizona is pre-paid, and as such, cost is not a barrier to voting by mail in Arizona.

To the extent there was testimony about Tribal mistrust of the mail system inasmuch as mail delivery may be slower at times, or mail sometimes was delivered to a nearby neighbor's address on accident, there was no evidence that this resulted in a particular

---

is not required if a court finds that the challenged voting practices do not impose a disparate burden on minority voters.") (internal quotes omitted) (citing *Ohio Democratic Party v. Husted*, 834 F.3d 620, 638 (6th Cir. 2016)). While the Court has considered the merits of the parties' positions, the Court's Order (in light of the exigent and truncated proceedings at bar) focuses on factors 2, 3, and 4 of the four factors that must be shown for a preliminary injunction, and finds that a preliminary injunction is not warranted.

Tribal member being unable to vote. To the extent there was testimony that Tribal members may prefer to vote in-person due to fears of fraud related to mail-in ballots, there was no evidence that these fears were based on evidence of any limited or widespread mail-in voter fraud.[11]

Even assuming that not voting via a mail-in ballot was justified by evidence, legitimate fears, unavailable, or one just preferred to deliver their ballot in-person to a voting site, this would not be a barrier to voting in the 2020 General Election. For example, as the majority of Tribal members on the Reservation already receive a ballot in the mail as they previously signed up for the PEVL, they can simply fill out their ballot at home, go to the nearest Early Voting Site, drop off their ballot in a box guarded by an election official, or hand it directly to an election official. Moreover, any Pima County resident can walk into a full-service Early Voting Site, immediately request and receive a ballot (regardless of their residential address and precinct – there are 249 precincts in Pima County[12]), and vote in advance for the General Election. The nearest 2020 Early Voting Site (i.e., the Mission Library) is approximately 8 miles[13] away from the Early Voting Site that was on the Reservation in 2016.

If a Tribal member did not want to travel off the Reservation, one could still hand their completed ballot to an election official at the official one-day/election day polling place ("Election Day Polling Site") which will be located on the Reservation on the day of the General Election; this site (at the Tribe's Wellness Center) is approximately 1 mile from the 2016 Early Voting Site (i.e., the Tribe's radio station) previously run by the Pima County Recorder.

To better understand this issue, it is important to highlight a few things. There are numerous distinctions between an Early Voting Site and an Election Day Polling Site in

---

[11] Tribal Council representatives testified that their voter education and outreach campaign has been substantial for the last several years, and they have mailed voter education materials to Tribal members' residences on the Reservation.
[12] As discussed in more detail below, these 249 precincts fall within the 9,500 square miles of Pima County; the Reservation (in precinct 110) is approximately 3 square miles within metropolitan Tucson (Tucson is within Pima County).
[13] The Court will discuss transportation issues related to this site later in this Order.

Pima County. Early Voting Sites in Pima County fall solely within the jurisdiction of the Pima County Recorder; the Recorder is an elected official, does not answer to the Pima County Board of Supervisors, and is solely responsible for handling early voting in Arizona such as Early Voting Sites and mail-in ballots. The Early Voting Sites often are open during normal business hours for one to three weeks leading up to an election; they are open for much longer periods of time than the one-day Election Day Polling Sites, require more staff, security and technology for longer periods of time, and are capable of serving and providing valid ballots for any Pima County voter in any of the 249 precincts in the county. These 249 precincts in Pima County are spread out over approximately 9,500 square miles; the Reservation is within a 3 square mile area within those 9,500 square miles – the Reservation is in precinct 110. Pima County is the 16th largest county in the United States, and its land mass is larger than the entire state of Connecticut. While the Recorder is only required to establish one Early Voting Site (i.e., at the Recorder's office or headquarters), she has the discretion to choose additional sites that she deems appropriate for the County. The Recorder has established 14 Early Voting Sites for the 2020 General Election; these sites are spread out throughout Pima County based on various factors including voter demand, and enhanced IT security and physical security features that became a heightened focus after foreign interference in the 2016 General Election.

In contrast to the one to three week operations connected to the Early Voting Sites run by the Recorder, the one-day Election Day Polling Sites in Pima County are solely within the jurisdiction of the Pima County Elections Department. The head of the Pima County Elections Department (i.e., the County Election Director) is not an elected official, and reports directly to the Pima County Board of Supervisors. Unlike the 14 Early Voting Sites (that can fully serve all 249 precincts), these one-day election sites are only capable of fully serving voters in one particular precinct on election day; and there are many more one-day Election Day Polling Sites in Pima County than Early Voting Sites. Much less staffing, technology and security is needed for each particular one-day Election Day Polling Site. The Pima County Recorder and the Pima County Elections Department have

separate staffs, separate budgets, and separate chains of command.

Returning to voting options available to Tribal members on the Reservation, even assuming that a member did not receive a ballot in the mail and it was too late to either request one, or receive one in time to vote by the October 30 early voting deadline, they could still vote in-person at the one-day Election Day Polling Site on the Reservation on November 3; a valid ballot would be provided that day as they arrive at the site.

There was also testimony relaying concerns about exacerbating factors relating to COVID-19, higher rates (compared to non-minority/non-Tribal populations) of Tribal poverty, poor health (obesity, diabetes, mobility issues), and how Tribal members were particularly vulnerable due to these comorbidities. As mentioned earlier, there was testimony that Tribal members preferred to vote in-person, and Plaintiff argues that Tribal members (who are particularly vulnerable during COVID-19) must therefore have an Early Voting Site on the Reservation to protect themselves against unnecessarily large crowds.

As discussed in detail above and further discussed here, there are numerous options available to completely avoid, or greatly mitigate, such risks. As the majority of Tribal members have already signed up for the PEVL, they can simply vote by mail by filling out their ballots, placing their ballot in their mailbox at their residence, and avoid any crowds altogether. Furthermore, if they prefer to go to a polling site, they can drive 8 miles to the nearest Early Voting Site (i.e., the Mission Library). There was testimony that the drive took approximately 20 minutes in one's own vehicle. While there was testimony that up to 30% of Tribal members did not have a vehicle, 70% did have a vehicle; testimony also reflected that some of those 30% could request and potentially receive a ride from the other 70% (i.e., a friend or family member).

To the extent that all of the 30% could not receive a ride from the other 70%, Plaintiff's testimony and arguments seemed to imply that public transit via the Tucson/Pima County-run Sun Tran bus service was the only option available to Tribal members on the Reservation. There was testimony that a one-way Sun Tran bus trip (which included various stops and a transfer) could take approximately an hour, and this could be

dangerous in light of COVID-19 and the aforementioned health issues. However, as the Chairman of the Tribe and Tribal Councilwoman Frias testified, the Tribe is not without resources. For example, as their testimony reflected, as to the Tribe's resources, the Tribe owns two casinos, has its own police and fire department, has a fleet of approximately 100 vehicles (including numerous vans) – some of which could be reconstituted for other purposes such as giving direct rides to Tribal members to a polling site[14], and has paved roads on the Reservation on which those vehicles can transport Tribal members. The Tribe also recently received $43,000,000 in COVID-19 assistance pursuant to the CARES Act (i.e., the $3 trillion relief bill passed by Congress on March 25, 2020 in response to the COVID-19 pandemic). As mentioned earlier, over the last several years, the Tribe's Council has substantially invested in voter education and outreach. Prior to the pandemic, the Tribe hosted dozens of in-person education and voter assistance fairs on the Reservation, and continued its efforts throughout the pandemic by hosting drive-by free T-shirt events with voter registration and education information, and continued to mail Tribal members on the Reservation voter education packets, and included face masks in those mailings encouraging them to vote.

The early voting site at the Mission Library also has drive-thru voting where a voter can simply hand a ballot to a poll worker or drop it in a box guarded by a poll worker. There was also testimony that although the Tribe was already providing various free transportation services to its members, including free pre-pandemic transportation services for its members to off-Reservation health appointments, such services were greatly limited during COVID-19 as many of the Tribe's drivers had comorbidities and were no longer driving for health reasons. However, there was no testimony that the Tribe sought to hire less vulnerable Tribal members without comorbidities, that none existed (or applied or were otherwise available and qualified), or that the Tribe sought to hire less vulnerable non-Tribal members to perform transportation services for its members.

---

[14] The testimony of Chairman Yocupicio and Councilwoman Frias reflected that these vehicles could be used to transport Tribal voters, and they have used Tribal vehicles for this purpose in the past.

- 12 -

To the extent the various options discussed herein are somehow not available to Tribal members to mitigate COVID-19 risks, the Court notes that as a general matter both Tucson and Pima County have passed COVID-19 mitigation ordinances that include measures such as mandating that masks must be worn at all times when a continuous distance of 6 feet can not be maintained between another person. In addition, at voting sites in Pima County, they have also established COVID-19 safety protocols whereby they have shifted more interactions and procedures outside to limit unnecessary time indoors pertaining to the voting process; for example, workers use additional equipment (such as tablets) outside to look up and provide information pertinent to voting. In addition, the County acquired a large volume of disinfectant, disinfecting wipes, and PPE such as gloves and masks to be used at voting sites. In addition, the County increased the availability of curbside drop-offs at Early Voting Sites whereby officials would be monitoring boxes at curbside where voters could drop ballots off in a supervised box, or hand it directly to an election official. These protocols would include the Mission Library Early Voting Site near the Reservation; curbside voting was available at that location starting on October 19.

As reflected in the discussion above, Plaintiff will not suffer irreparable harm without an injunction, and the equities and public interest do not favor Plaintiff. While it is true that Plaintiff no longer has an Early Voting Site on the three square miles of the Reservation (within precinct 110), that is also true for the vast majority of the 249 precincts within Pima County which covers 9,500 square miles. There are only a total of 14 Early Voting Sites in Pima County. Likewise, although Tribal Members may have to travel approximately 8 miles to their nearest Early Voting Site at the Mission Library, there are many other voters that have to travel greater distances. For example, voters near the Vail area have to travel 12 to 14 miles to their nearest Early Voting Site; voters near the base of the Santa Rita Mountains have to travel 30 miles to their nearest Early Voting Site; voters living at Mount Lemmon have to travel 27 miles to their nearest Early Voting Site; and many other voters also have to travel between 20 and 30 miles to their nearest Early Voting Site. While it would be optimal to have an Early Voting Site in all 249 precincts in Pima

County, that is not feasible. Some of these Early Voting Sites have varying levels of voter turnout as well. For example, the Early Voting Site (i.e., the Tribe's radio station) on the Reservation (precinct 110) in the 2016 General Election (a presidential election) had a total of 29 individuals living on the Reservation that voted at that site over the course of one week; in 2014 (a midterm election), a total of 8 voted at that site; in 2012 (a presidential election), a total of 12 voted at that site. Total voter turnout from precinct 110 was substantially lower than many of the other precincts. Of those 29 individuals in the 2016 General Election, it is unclear how many were Tribal members as there are individuals living on the Reservation that are not members of the Tribe. In addition, at least one of the Tribal members that voted early at the Tribe's radio station was an employee who worked as a disc jockey at the site.

Testimony at the evidentiary hearing reflected that forcing the Recorder to add a last-minute Early Voting Site on the Reservation would cause substantial hardship and disruption to the Recorder's ongoing administration of Pima County's election, and would damage the public's interest in ensuring timely and proper administration of the election. The Recorder's office is extremely busy, and is currently dealing with numerous moving parts leading up to the election, and is already stretched to its breaking point. For example, the Recorder recently mailed out over 500,000 early ballots to Pima County voters, and those completed ballots are returning to the Recorder at historic and unprecedented rates via mail or curbside drop offs at Early Voting Sites.

The Recorder's office is still entering recent voter registrations into the system, they are receiving and picking up thousands of early voting ballots every day, they have 10 couriers constantly running multiple trips all day to the post office and Early Voting Sites to pick up early ballots, and they recently had to call in law enforcement for traffic control as there was a three-quarter mile long stretch of cars to take advantage of curbside drop off of ballots at an Early Voting Site.

The Recorder's office has already received 200,000 completed ballots in the mail. They currently have 45 workers just doing signature verifications as to 30,000 to 40,000

recently received ballots, and they are processing about 25,000 ballots each day. Their employees are overwhelmed by the sheer volume of voters, lines, and ballots. Temporary employees are working approximately 7 hours a day, 7 days a week; non-managerial permanent employees are working in the 60 to 70 hour a week range, and managerial employees are working in the range of 80 to 90 hours a week. Although the Recorder was fully staffed in recent weeks, they are losing 1 (and sometimes two) workers a day due to them quitting from feeling overwhelmed, and they may be down to one or two back up workers which they may also lose (and more) given current patterns.[15] In addition, all 14 Early Voting Sites are going fully operational on October 26.

Plaintiff has not met its burden to show irreparable harm, and compelling the Pima County Recorder to set up a last-minute Early Voting Site would cause substantial hardship to the Recorder's ability to properly administer the election, and would hurt the public interest inasmuch it would detrimentally impact the ongoing 2020 General Election in Pima County. Plaintiff's motion for a preliminary injunction is denied.

Dated this 22nd day of October, 2020.

Honorable James A. Soto
United States District Judge

---

[15] The Court notes that Plaintiff offered testimony reflecting that the Arizona Secretary of State had funds available to potentially reimburse County Recorders for additional costs incurred in providing early voting opportunities on Tribal lands, that a mobile voting RV could be available within seven days of a request, that a list of thousands of voting site volunteers was potentially available, and that an early ballot drop box was available as well. As to the potential volunteers, the testimony could not identify how many volunteered for a one-day Election Day Site v. an Early Voting Site that could last one to three weeks; the testimony also could not verify how many of those volunteers were identified on volunteer forms as Democrat, Republican, or Independent (the Pima County Recorder received an overabundance of Democrat volunteers, but was required by law to balance the volunteers with Republicans and Independents – which were hard to find and lacking resulting in the current staffing crisis); the mobile RV did not come with trained staff to handle early voters, and the drop box on Tribal land would require constant supervision by Pima Recorder workers who are already overwhelmed and whose numbers are dwindling.